Raymond JEFFERSON, Appellant

v.

The STATE of Texas.

No. PD–0363–05.

Court of Criminal Appeals of Texas.

April 12, 2006.

Keith A. Gross, Pearland, for Appellant.

Alan Curry, Asst. District Atty., Houston, Matthew Paul, State's Atty., Austin, for State.

## OPINION

HERVEY, J., delivered the opinion of the Court in which MEYERS, KEASLER, HOLCOMB and COCHRAN, JJ., joined.

A jury unanimously found appellant guilty of the offense of injury to a child.[1] The issue in this case is whether a jury instruction was required informing the jury that it also had to unanimously agree on at least one of these three theories in order to convict: (1) that appellant injured the child by commission (striking the child with his foot or with an unknown object), or (2) that appellant injured the child by omission by failing to prevent the child's mother from injuring the child, or (3) that appellant injured the child by omission by failing to provide proper medical care for the child. We hold that the jury in this case was not required to unanimously agree on any of these theories.

Appellant, the child and the child's mother lived together. The evidence shows that appellant and the child's mother severely abused the child for approximately two years. This pattern of abuse

1. TEX. PEN CODE, § 22.04, defines the offense of injury to a child in relevant part as:
   (a) A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, elderly individual, or disabled individual:
      (1) serious bodily injury;
      (2) serious mental deficiency, impairment, or injury; or
      (3) bodily injury.
   (b) An omission that causes a condition described by Subsections (a)(1) through (a)(3) is conduct constituting an offense under this section if:

   (1) the actor has a legal or statutory duty to act; or
   (2) the actor has assumed care, custody, or control of a child, elderly individual, or disabled individual.

* * *

(d) For purposes of an omission that causes a condition described by Subsection (a)(1), (2), or (3), the actor has assumed care, custody, or control if he has by act, words, or course of conduct acted so as to cause a reasonable person to conclude that he has accepted responsibility for protection, food, shelter, and medical care for a child, elderly individual, or disabled individual. . . .

culminated in a September 7, 2001, incident (or transaction) during which the child was severely injured. The child was struck by some object, causing her to fall and hit her head. Neither appellant nor the child's mother sought medical attention for the child even though the child was obviously in great distress. The child died very soon after being struck. The mother initially told the police that she struck the fatal blow to the child during the September 7, 2001, episode. She testified at trial, however, that appellant struck the fatal blow to the child during this incident.

On this record, it is not clear that the State sought to convict appellant based solely on the September 7, 2001, incident. However, several things in the trial record and the parties' briefs lead us to conclude that the State was relying on this incident. In a reply brief, appellant does not dispute the State's assertion in its original brief that it was not "relying upon multiple acts of serious bodily injury in order to support the appellant's conviction."

Also, during its closing jury arguments, the prosecution referred to the prior acts of abuse, not as a basis to convict, but to explain why appellant and the mother did not seek medical attention for the child during the September 7, 2001, incident.

[PROSECUTION]: I don't expect you to like [the mother]. I can't stand the woman. I don't expect you to have one ounce of sympathy for her because she lied. The whole family lied. Why? To cover up their little scapegoat of a child who was a disgrace to the family, who was battered and bruised with 56 different injuries. They couldn't take that child to the doctor. They knew they'd both be getting arrested immediately. They couldn't—that's why they intentionally and knowingly did not call 9–1–1

. . .

The prosecution's closing jury arguments focused almost entirely on the September 7, 2001, incident as the basis to convict. For example,

[THE PROSECUTION]: You do not have to agree on whether or not [appellant] did it by co-mission [sic] or omission and that's what we talked about in voir dire. And the reason that's so is because [the mother] gave conflicting statements.

Now the greater weight of the evidence clearly supports that [appellant] is the one who physically kicked [the child] with such force it caused her head to strike something which caused her to be shaking, foaming at the mouth, go unconscious and she eventually died. That's the greater weight of the evidence. But if some of you believe that I'm not so sure about that but I believe that he had care, custody and control of that child, he believed he was the father, at the very least he was the stepfather living in that house as a family and he did not pick up the phone to call 9–1–1 to get medical treatment for that child it doesn't matter if you agree six of one half dozen of the other it's still a guilty verdict for injury to a child.

\* \* \*

When a grown man, whatever it is, he weighs somewhere between 250 and 280, kicks a weak, malnourished 47 pound six year old with the kind of force that it's going to take to cause that kind of head trauma that's knowingly. When an adult kicks a small, weak, defenseless child that is knowingly. You know you're going to hurt her and you know you're going to hurt her bad because you're an adult and that is a small, defenseless child. You know you're going to hurt that child when that child is laying on the floor, foaming at the

mouth and shaking and unconscious and her body is twitching because she's convulsing. You know if you don't pick up the telephone you know that child is probably going to die. You know that.

* * *

When you look at the facts of this case and the evidence that you heard you may not have every detail answered in your mind but you don't have to. When you look at it and you step back and you look at the big picture what do you see? You see two parents who really didn't ever deserve to have a child and those parents let that child die. They killed that child. [The mother] and [appellant] killed that child and the reason that he is here is because of his action and his in-action and the reason that [the mother] is also here is because of her action and her in-action.

* * *

[Appellant] tells you that finally he admits to being home that day off sick and says well yeah, [the child] was there. Finally admits yeah [the child] was in the house September 7, 2001, then he says but I wasn't. Now mind you he was sick, that he called in sick, off work. He had diarrhea that day. I had to go to the store for diarrhea medicine. He tells you that he's gone for six hours. He walks to Walgreens and he's gone for six hours and goes and sits at a bus stop for six hours. And I don't mean to be crude but when you got diarrhea where do you want to be? At home by your own private bathroom not walking on the streets of Houston, Texas for six hours sitting in a bus stop when you've got diarrhea. He's a liar.

The facts make sense when you put the picture together and [the mother] and [appellant] are equally responsible for the death of [the child] and I'm going to ask you to find him guilty of intentionally or knowingly causing serious bodily injury to this child. We will never know if this child could have lived. We will never know and we don't have to prove to you that she could have survived if they called 9–1–1.

Dr. Wolf says sometimes they do and sometimes they don't but my God folks you at least try.

During its closing jury arguments, the defense emphasized several times that this case was "about the events that happened on September 7, 2001," even though the "prosecution would have [the jury] rule on the events as they occurred over two years." For example,

[THE DEFENSE]: That's what he did. What happened that day? This trial is about the events that happened on September 7, 2001. The events you're asked to rule on, to rule on to determine guilt or innocence are the events that occurred on September 7, 2001, when [the child] was killed.

The prosecution would have you rule on the events as they occurred over two years. They would just assume that you find him guilty for what happened in August, July or May or any of those prior events. If you're going to look and you're going to say well we don't care so much about September 7 we're just going to rule guilty because the child was there, he must have known, let's just hang him right now.

The prosecution's response to this during its final closing jury arguments was somewhat ambiguous. The prosecution did not expressly and unequivocally argue that the jury should "rule on the events as they occurred over two years" as a basis to convict. For example,

[THE PROSECUTION]: We don't care whether or not you believe that on the

night of September 7 [appellant] kicked that child so hard-there are no holes in the wall by the way, but so hard that some object impacted her head and she died at the hands of [appellant]. I don't care. I don't care. That child's death was inevitable. This was going to be the result. It culminated, in a moment on September 7, 2001 but there was no other outcome. It would have happened whether it was the next day or the day before or two, three or four days later or a week later. That child was dead and we all know it. And I can't for the life of me see how another human being wouldn't stop it. Thank you.

The jury was instructed that it could convict appellant if it found that appellant caused serious bodily injury to the child on or about September 7, 2001, under multiple theories submitted disjunctively.

Now, if you find from the evidence beyond a reasonable doubt that the defendant, Raymond Jefferson, in Harris County, Texas, on or about the 7th day of September 2001, did then and there unlawfully intentionally or knowingly cause serious bodily injury to Raysate Knight, a child younger than fifteen years of age, by striking Raysate Knight with his foot; or

If you find from the evidence beyond a reasonable doubt that the defendant, in Harris County, Texas, on or about the 7th day of September 2001, did then and there unlawfully intentionally or knowingly cause serious bodily injury to Raysate Knight, a child younger than fifteen years of age, by causing Raysate Knight's head to strike an unknown object; or

If you find from the evidence beyond a reasonable doubt that the defendant, in Harris County, Texas, on or about the 7th day of September 2001, did then and there unlawfully while having assumed care, custody or control of Raysate Knight, intentionally or knowingly by omission cause serious bodily injury to Raysate Knight, a child younger than fifteen years of age, by failing to intercede or stop the physical abuse of Raysate Knight by Connie Knight; or

If you find from the evidence beyond a reasonable doubt that the defendant, in Harris County, Texas, on or about the 7th day of September 2001, did then and there unlawfully while having assumed care, custody or control or Raysate Knight, intentionally or knowingly by omission cause serious bodily injury to Raysate Knight, a child younger than fifteen years of age, by failing to provide proper medical care to Raysate Knight;

Then you will find the defendant guilty of intentionally or knowingly causing serious bodily injury to a child younger than fifteen years of age, as charged in the indictment.[2]

The jury unanimously convicted appellant of "intentionally or knowingly causing serious bodily injury to a child younger than fifteen years of age, as charged in the indictment," and sentenced him to life in prison.[3] Appellant claimed on direct ap-

---

**2.** The jury was then instructed to consider whether appellant was guilty of recklessly causing serious bodily injury to a child if it had a reasonable doubt on whether appellant was guilty of intentionally or knowingly causing serious bodily injury to a child. The trial court submitted separate verdict forms (one for intentionally or knowingly causing serious bodily injury and one for recklessly causing

serious bodily injury) to take into account the separate punishment ranges between the former and the latter. *See* Tex. Pen.Code, § 22.04(e) (intentionally or knowingly causing serious bodily injury is first degree felony and recklessly causing serious bodily injury is second degree felony).

**3.** The record reflects that appellant's first trial ended in a mistrial. The verdict form in

peal that "the jury charge permitted a finding of guilt on less than a unanimous verdict."[4] The Court of Appeals decided that appellant's right to a unanimous verdict was not violated because "it is proper to charge a jury in the disjunctive with multiple theories of committing a single offense." *Jefferson,* slip op. at 3, 2004 WL 3202874.[5] The Court of Appeals distinguished our decision in *Francis v. State*[6] because there "two separate offenses [occurring on different dates] were submitted to the jury in the disjunctive, not [as in this case] one offense with alternate theories of commission." *Jefferson,* slip op. at 3–4. This Court granted appellant's petition for discretionary review. The sole ground upon which we granted review states:

> Where alternate theories of committing the same offense have separate, distinct elements, a defendant is entitled to a unanimous verdict under the 14th Amendment.

Appellant argues that due process requires more than jury unanimity that the child suffered a serious bodily injury. In his brief, he argues:

> 11 .... injury to a child by act, injury to a child by omission, for failing to intercede and stop the abuse of [the child], and injury to a child by omission, by failing to seek proper medical care are not the same, single, specific, crimi-

appellant's first trial required the jury to unanimously agree that appellant committed the offense by commission or to unanimously agree that he committed it by omission, and appellant urged that this is how the jury should have been charged in his retrial. During the charge conference at appellant's retrial, the trial court ruled that it would not charge the offense this way.

> [THE COURT]: Okay. We can get on the record because I've made up my mind how I'm going to rule.
> [THE DEFENSE]: Your Honor, is The Court not going to separate omission from co-mission?
> [THE COURT]: You mean on the verdict page?
> [THE DEFENSE]: On the verdict page.
> [THE COURT]: No, I'm not going to.
> [THE DEFENSE]: That means only one person can find guilty, if they find he had care, custody and control. If 11 people think he's guilty of co-mission of actually doing it and only one person thinks he's guilty of omission—
> [THE COURT]: He can be convicted.
> [THE DEFENSE]: He can be convicted.
> [THE COURT]: Right. That's right or it can be any combination.
> [THE DEFENSE]: 12 people don't have to find that he had care, custody and control to be guilty of omission.
> [THE COURT]: Not if they found that he committed—if 12 people find him guilty of omission they all 12 have to find that he

had care, custody and control and that's clear from the charge because that's in the application paragraph and even in the omission paragraph says having care, custody and control did it fail to do whatever.
> [THE DEFENSE]: I just know last time we had one person that thought he did it for co-mission and some people thought he was guilty, or most people thought he was guilty of omission and that means if 11 people find him guilty of omission that means one person didn't find him guilty but didn't find he had care, custody and control. They were never—
> [THE COURT]: They don't have to all find omission or co-mission. There can be a combination and that was the problem with the way I submitted it last time. I shouldn't have submitted it that way. I could have submitted it a different way or this way and I'm going to submit it this way this time.

4. *Jefferson v. State,* No. 14–03–01050–CR, 2004, slip op. at 2, 2004 WL 3202874 (Tex. App.-Houston [14th Dist.], Delivered November 24, 2004) (not designated for publication).

5. The September 7, 2001, incident arguably involved a single offense committed by multiple means (act or omission) causing one injury resulting in death.

6. 36 S.W.3d 121 (Tex.Cr.App.2000).

nal act committed at the same time or with the same *mens rea* and the same *actus reus*. Either [appellant] committed the injury to a child, or he failed to prevent [the mother] from committing the injury. Not only are both acts different acts, but they are conflicting acts. [Appellant] can not be guilty of both injuring the child, and failing to prevent [the mother] from injuring the child. Furthermore, failing to seek medical attention is not the same act. Failing to seek medical attention presupposes a condition exists that requires medical attention.

12. The charge submitted was error because: (1) less than twelve jurors could have agreed that [appellant] actually hit the child; (2) less than twelve jurors could have agreed that [appellant] assumed care, custody, or control of the child; (3) less than twelve jurors could have agreed that [appellant] had a legal duty to prevent [the mother] from committing the injury; (4) less than twelve jurors could have agreed that [appellant] knew [the mother] was going to injure the child; or (5) less than twelve jurors could have agreed that the serious bodily injury resulted from [appellant's] failure to seek medical attention. As you can see, the only common element between "act" and "omission" that the jury required unanimity on was that [the child] suffered a serious bodily injury. Surely "Due Process" required more.

▉▉ "Under our state constitution, jury unanimity is required in felony cases, and, under our state statutes, unanimity is required in all criminal cases." *Ngo v. State,* 175 S.W.3d 738, 745 (Tex.Cr.App., 2005). However, as the Wisconsin Supreme Court explained in *State v. Johnson,* 243 Wis.2d 365, 627 N.W.2d 455, 459–

60, *cert. denied,* 534 U.S. 1043, 122 S.Ct. 621, 151 L.Ed.2d 543 (2001):

> To say that the jury must be unanimous, however, does not explain what the jury must be unanimous about. For this we look to the statutory language defining the crime and its elements. "The principle justification for the unanimity requirement is that it ensures that each juror is convinced beyond a reasonable doubt that the prosecution has proved each essential element of the offense." [Citation omitted]. Thus, while jury unanimity is required on the essential elements of the offense, when the statute in question establishes different modes or means by which the offense may be committed, unanimity is generally not required on the alternate modes or means of commission. [Citation omitted].

> Ordinarily, then, the first step in a unanimity challenge is an examination of the language of the statute in order to determine the elements of the crime and whether the legislature has created a single offense with multiple or alternate modes of commission. [Citation omitted]. "The point is to determine legislative intent: did the legislature intend to create multiple, separate offenses, or a single offense capable of being committed in several different ways?" [Citation omitted]. For example, where the legislature has specified that any of several different mental states will satisfy the intent or mens rea element of a particular crime, unanimity is not required on the specific alternate mental state as long as the jury unanimously agrees that the state has proven the intent element beyond a reasonable doubt. [Citation omitted].[7]

7. *See also Richardson v. United States,* 526 U.S. 813, 817–19, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999) (courts must examine language of statute to determine whether partic-

Federal constitutional due process considerations, however, limit the state's ability to define a crime so as to dispense with the requirement of jury unanimity on the alternate means or modes of committing it. [Citations omitted]. So the second step in the analysis is an evaluation of whether the lack of jury unanimity on the alternate means or modes of commission violates due process. [Citation omitted]. This involves an inquiry into the fundamental fairness and rationality of the legislative choice, starting, however, with a presumption that the legislature has made its determination fairly and rationally. [Citation omitted]. As we noted in [citation omitted], the due process fundamental fairness and rationality test for unanimity challenges was established by the Supreme Court in *Schad* [8] and focuses on historical practice and the relative moral and conceptual equivalence of the alternate modes or means of committing the crime. [Citation omitted].[9]

The first question we address, then, is whether the Legislature intended to make "act or omission" in Section 22.04(a) separate elements of the offense or underlying "brute facts [or means that] make up a particular element." *See Richardson*, 526 U.S. at 817–18, 119 S.Ct. 1707. We believe it clear that the Legislature intended the latter—that "act or omission" constitute the means of committing the course of conduct element of injury to a child.

■ The language of Section 22.04(a) and prior case-law support this construc-

tion. Section 22.04(a)(1) states, in relevant part, that a person commits the offense of injury to a child if (with a particular culpable mental state) he causes serious bodily injury to a child by "act or omission." *See* Footnote 1. Construing the statute to mean that the conduct element of the offense can be committed by a combination of these two means is consistent with its plain language. This Court's prior case-law also supports a decision that the essential element or focus of the statute is the result of the defendant's conduct (in this case, serious bodily injury to a child) and not the possible combinations of conduct that cause the result. *See Alvarado v. State*, 704 S.W.2d 36, 39 (Tex.Cr.App.1985) (because injury to child statute does not specify the "nature of conduct," the conduct is inconsequential to its commission as long as "the conduct (whatever it may be is voluntary) and done with the required culpability to effect the *result* the Legislature has specified") (emphasis in original); *Beggs v. State*, 597 S.W.2d 375, 377 (Tex.Cr.App.1980) (injury to child statute focuses on result of suspect's conduct). We, therefore, decide that "act or omission" are not elements of an injury to a child offense about which a jury must be unanimous.

■ In support of his jury-unanimity claim, appellant relies on this Court's decision in *Ngo*. This case is distinguishable from *Ngo*. In *Ngo*, the State sought one conviction for credit-card abuse with evidence that at different times the defendant

---

ular term in statute is an element, which requires juror unanimity, or an underlying brute fact or means of committing an element which does not require juror unanimity); *Ngo*, at 747 n. 32 (juror unanimity required on elements but not on the means by which the elements are accomplished).

**8.** *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (plurality op.).

**9.** *See also Richardson*, 526 U.S. at 82, 119 S.Ct. 17070 ("Constitution itself limits a State's power to define crimes in ways that would permit juries to convict while disagreeing about means, at least where that definition risks serious unfairness and lacks support in history or tradition").

committed three different acts that the applicable statute defined as separate criminal offenses and not as means of committing a single criminal offense. *See Ngo*, at 745.[10] In this case, however, the State sought one conviction for an injury to a child offense with evidence that during the September 7, 2001, incident appellant committed three different acts that the applicable statute defines as means of committing a single criminal offense and not as three separate criminal offenses. In other words, with the focus limited to the September 7, 2001, incident, *Ngo* is distinguishable because the applicable statute in *Ngo* defined the three acts involved as separate criminal offenses while the applicable statute here defines the three acts involved as means of committing a single criminal offense.[11]

■ This presents the question of whether dispensing with jury unanimity on

the "act or omission" that comprise the course of conduct element of the offense violates due process under *Schad*. *See Johnson*, 627 N.W.2d at 461; *see also Richardson*, 526 U.S. at 820 and at 836–37, 119 S.Ct. 1707 (Kennedy, J., dissenting). We decide that dispensing with unanimity does not violate due process because the acts or omissions that combine to establish the offense in this particular case are "basically morally and conceptually equivalent." *See Johnson*, 627 N.W.2d at 461; *Schad*, 501 U.S. at 643, 111 S.Ct. 2491 (due process question is whether one means "may ever be treated as [the] equivalent" of another). These acts and omissions all involve the same injury to the same child during the same transaction with a similar level of culpability. *See Johnson*, 627 N.W.2d at 461.

The resolution of the due process component of the analysis essentially requires

10. In *Ngo*, the indictment contained three paragraphs that improperly alleged three separate statutorily defined offenses during three different episodes: 1) stealing a credit card, 2) receiving a stolen credit card, and 3) fraudulently presenting a credit card to pay for goods or services. *See Ngo*, at 748 and at 8 (prosecution sought conviction for the commission of one offense by proving any of three different criminal acts, occurring at three different times, and in three different ways); *see also* Article 21.24(a), Tex.Code Crim. Proc., (two or more offenses may be joined in a single indictment with each offense stated in a separate count if they arise out of the same criminal episode).

11. We also note that at least one other jurisdiction has held in cases like this that no unanimity instruction is required "when the acts [of abuse] are so closely connected that they form part of one and the same transaction, and thus one offense" or when the applicable statute "contemplates a continuous course of conduct of a series of acts over a period of time." *See People v. Napoles*, 104 Cal.App.4th 108, 127 Cal.Rptr.2d 777, 782–84 (1st Dist.2002, review denied); *see also State v. Sleeper*, 150 N.H. 725, 846 A.2d 545, 548 (2004) (statute defining crime as "involving a

continuous course of conduct does not require jury unanimity on any specific, discrete act, as that specific act itself is not criminalized"). The *Napoles* Court explained that this second category has been applied "to a limited number of varying crimes, including ... *child* abuse" and that when, as here, the statutory language "focuses on the goal or effect of the prohibited crime, the offense is a continuing one" with no requirement of a unanimity instruction on the multiple acts that constitute the single criminal event. *See Napoles*, 127 Cal.Rptr.2d at 783 (emphasis in original); *see also Richardson*, 526 U.S. at 821, 119 S.Ct. 1707 (discussing state cases involving crimes against children as presenting "special difficulties" justifying an exception to traditional jury unanimity rules). This case does not require us to decide whether Section 22.04(a) "contemplates a continuous course of conduct of a series of acts over a period of time" because our focus is on the September 7, 2001, incident which involves acts "so closely connected that they form part of one and the same transaction, and thus one offense." *See Napoles*, 127 Cal.Rptr.2d at 783.

a decision on whether this case falls within one of two scenarios described in Justice Scalia's concurring opinion in *Schad,* 501 U.S. at 648–52, 111 S.Ct. 2491 (Scalia, J., concurring in part and concurring in the judgment). The first involves "novel 'umbrella' crimes (a felony consisting of either robbery or failure to file a tax return) where permitting a 6-to-6 verdict would seem contrary to due process." *Schad,* 501 U.S. at 650, 111 S.Ct. 2491 (Scalia, J., concurring). The other is when "a woman's charred body has been found in a burned house, and there is ample evidence that the defendant set out to kill her, it would be absurd to set him free because six jurors believe he strangled her to death (and caused the fire accidentally in his hasty escape), while six others believe he left her unconscious and set the fire to kill her." *See id.*

This case fits more readily in the latter scenario. We believe that it would be equally "absurd" to set appellant free because, for example, six jurors may have believed that he struck the fatal blow to the child while six other jurors may have believed that he failed to pick up the phone and call 9-1-1 to seek medical help for a child who was obviously very seriously injured and in great distress.

The judgment of the Court of Appeals is affirmed.

KELLER, PJ., concurred.

WOMACK, J., dissented.

COCHRAN, J., filed a concurring opinion in which PRICE and JOHNSON, JJ., joined.

1. Tex. Penal Code § 22.04.

2. *See Rodriguez v. State,* 104 S.W.3d 87, 90–91 (Tex.Crim.App.2003) (holding that when the

COCHRAN, J., filed a concurring opinion, in which PRICE and JOHNSON, JJ., joined.

I join the majority opinion. I write separately only because the resolution of cases of this nature may not be intuitively obvious to the discerning reader, except perhaps to one's eighth-grade English teacher who is accustomed to parsing sentences and diagraming adverbial phrases.

As the majority correctly holds, the unanimity requirement is directed toward that act which makes the conduct criminal. To determine the forbidden conduct, we look to the statute defining the penal offense. In defining the offense of injury to a child, the legislature (perhaps inelegantly) stated:

> (a) A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, elderly individual, or disabled individual:
>
> (1) serious bodily injury;
>
> (2) serious mental deficiency, impairment, or injury; or
>
> (3) bodily injury.[1]

To determine what conduct the jury must be unanimous about, we look for the main (transitive) verb in the statute. It is "causes." Because the verb "causes" requires a direct object, the full description of the prohibited conduct, under section 22.04(a)(1) as alleged in this case, is "causes serious bodily injury." The other elements that require unanimity are: the defendant; the person who suffered serious bodily injury; and the specific occasion on which the act occurred (usually designated by a given date, but, as recent cases have shown, this element is a moveable feast).[2]

indictment alleges only one occurrence of delivery of a controlled substance, the State may introduce other instances of controlled sub-

But, one might reasonably ask, aren't "striking Raysate Knight with his foot," "causing Raysate Knight's head to strike an unknown object," "failing to intercede or stop the physical abuse of Raysate Knight by Connie Knight," and "failing to provide proper medical care to Raysate Knight," all very different acts? Yes, of course they are. But the specifics of how the defendant caused serious bodily injury are not the gravamen of the offense and not the statutorily prohibited conduct. In this statute, the legislature was concerned about the result of the defendant's conduct; he caused serious bodily injury. It really doesn't matter, for purposes of criminal liability, *how* he did it. He may have done it with an affirmative act; he may have done it by failing to act when he should have acted. He may have hit her, bitten her, poisoned her, or failed to stop someone else from hitting her, biting her, or poisoning her. It would be nice to know *exactly* what the defendant did—precisely what act he performed or failed to performed that caused serious bodily injury—but the legislature did not predicate criminal liability for injury to child on the specific act the defendant performed. It is enough, for purposes of criminal liability, that the defendant did "something" or failed to do "something," and that act, whate'er it may be, caused serious bodily injury.

Returning to our eighth-grade English teacher, how does she know the distinction between the "main" verb which defines the prohibited conduct and to which the jury unanimity requirement applies, and descriptive phrases that define the "manner and means" by which the defendant commits the prohibited act? Usually, those descriptive averments are adverbial phrases introduced by the preposition "by." Thus, "*by* striking Raysate Knight with his foot," "*by* causing Raysate Knight's head to strike an unknown object," "*by* failing to intercede or stop the physical abuse of Raysate Knight by Connie Knight," and "*by* failing to provide proper medical care to Raysate Knight," are all adverbial phrases describing precisely *how* the defendant caused serious bodily injury to Raysate.[3]

The use of the prepositional word "by" in either a statute or an indictment is a tip-off that probably (eighth-grade teachers are rarely dogmatic and always leave the door open for idiosyncracies)[4] the phrase will be a description of how the offense was committed. But that phrase is not the gravamen of the offense, and it is not the legislative definition of the prohibited conduct for which jury unanimity is required.

In sum, we must return to eighth-grade grammar to determine what elements the jury must unanimously find beyond a rea-

---

stance deliveries to the same person under the theory that the deliveries are part of the charged offense); *see also Sledge v. State,* 953 S.W.2d 253 (Tex.Crim.App.1997); *Rankin v. State,* 953 S.W.2d 740 (Tex.Crim.App.1996).

**3.** *See, e.g., Ngo v. State,* 175 S.W.3d 738, 746, n. 27 (Tex.Crim.App.2005) (noting that the gravamen of the offense of murder, on which the jury must be unanimous, is causing the death of a person, such as Rasputin; but the jury need not be unanimous on the manner and means—"by poisoning, garroting, shooting, stabbing, or drowning"—of how Prince Yussupov caused Rasputin's death).

**4.** For example, the legislature could have written the injury to a child statute in a particularly inelegant way:

> A person commits the offense of injury to a child by causing serious bodily injury to a child.

In that case, of course, the gravamen of the offense is still "cause serious bodily injury" because that is still the prohibited conduct and it is still the main verb defining the conduct.

sonable doubt. At a minimum, these are: the subject (the defendant); the main verb; and the direct object if the main verb requires a direct object (i.e., the offense is a result-oriented crime); and the specific occasion (the date phrase within the indictment, but narrowed down to one specific incident regardless of the date alleged[5]). Generally, adverbial phrases, introduced by the preposition "by," describe the manner and means of committing the offense. They are not the gravamen of the offense, nor elements on which the jury must be unanimous.

With these comments, I join the majority opinion.

---

**5.** *See, e.g., O'Neal v. State,* 746 S.W.2d 769, 771 (Tex.Crim.App.1988).