IN THE COURT OF CRIMINAL APPEALS

OF TEXAS





NO. PD-0718-06 & 0719-06






GREGORY LEE VILLANUEVA, Appellant



v.



THE STATE OF TEXAS




ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE FIRST COURT OF APPEALS


BURLESON COUNTY






 Cochran, J., filed a concurring opinion.


OPINION 


 

 I join the majority opinion. I agree that, as we so recently reiterated in Jefferson v.
State, (1) the gravamen of the offense of injury to a child is the result of the criminal conduct-
the serious bodily injury or death suffered by the victim- not whether that injury was caused
by an affirmative act or a failure to act. (2) 

 The "shaken baby" death (3) of seven-week-old Greg was a despicable, but all-too-frequent,
crime that is repeated in Texas homes every year. The evidence showed that appellant caused
his infant son's death by first shaking him so violently (and perhaps hitting him against some
hard object such as a wall) that he suffered a massive brain hemorrhage and then by failing to
seek medical treatment for that grievous injury. But for appellant's criminal act of violently
shaking Greg, that child would not have died. (4) It is conceivable, though not proven, that Greg
might have survived in a persistent vegetative state had his massive brain injuries been treated
immediately. (5) The jury in this case recognized the enormity of that crime and punished
appellant accordingly with a sentence of fifty years' imprisonment and a deadly-weapon
finding.

 But appellant did not commit two separate and distinct offenses of injury-to-a-child. 
Little Greg could die but once. And it is his death that was the result of appellant's criminal
conduct, whether committed by an affirmative act or by the failure to act. As we explained in
Jefferson, a jury need not be unanimous on whether the serious injury suffered by children
such as Greg is the result of an act or omission because "[t]hese acts and omissions all involve
the same injury to the same child during the same transaction with a similar level of
culpability." (6) Thus, "the acts or omissions that combine to establish the offense in this
particular case are 'basically morally and conceptually equivalent.'" (7) In Jefferson, we cited
out-of-state cases which had held the same. (8) If the jury need not be unanimous on whether
Greg's death was caused by affirmative act or omission, then it inexorably follows that double
jeopardy principles bar two injury-to-a-child convictions for that one death.

 The State, both at trial and on appeal, was laboring under the mistaken belief that the
offense of injury to a child is a "conduct" offense, not a "result" offense. (9) But this Court had
correctly held, in 1985, that injury to a child is a "result oriented" crime. (10) That issue is
settled. Therefore, the State could not obtain two injury-to-a-child convictions for the single
death of Greg.

 On the other hand, it is entirely possible that, in an appropriate case, the State could
obtain two such convictions if a child suffers two distinct serious bodily injuries. For
example, suppose that a parent intentionally, knowingly, or recklessly pokes his finger in his
child's eye and causes the child to go blind. That is a serious bodily injury. The crime of
injury to a child is complete. Suppose also that the parent then fails to seek medical assistance
for that eye injury. As a result of that failure, the eye socket becomes infected, the infection
travels to the brain, and the child suffers irreversible brain damage. This is a separate serious
bodily injury, an injury that would not have occurred but for (1) the original affirmative act of
poking the child's eye, and (2) the separate criminal conduct of failing to seek medical
attention for the already-injured eye. In this instance, the parent is criminally liable for two
distinct injuries, neither of which would have occurred but for the parent's conduct. Double
jeopardy would not bar two convictions, but each conviction would require a separate and
unanimous jury verdict. 

 In "shaken baby" cases, it is conceivable that the State could obtain two separate
convictions for two separate serious bodily injuries. If the evidence clearly showed that the
affirmative act of shaking the baby caused one specific injury (e.g., retina detachment, broken
ribs, temporary brain swelling), and that the failure to seek immediate medical attention for
that original injury caused death (or permanent brain damage) which otherwise would not have
occurred but for the failure to take the child to the hospital, these are two discrete serious
bodily injuries. 

 There was, however, no such evidence in this case that neatly carved up little Greg's 
injuries into "affirmative act" injuries and "omission" injuries. Indeed, there would rarely be
such a division of injuries in "shaken baby" cases. That may well be part of the reason why the
Legislature drafted the injury-to-a-child statute in the manner it did- the State need not prove
precisely which act or omission, what precise manner or means, caused the baby's death or
serious bodily injury. It is the result of the criminal conduct that is a gravamen of the offense,
and the crime itself is so grave that it is a first-degree offense, punishable by 5-99 years or life
in prison. 


Filed: June 27, 2007

Publish
1. 189 S.W.3d 305 (Tex. Crim. App. 2006). 
2. Id. at 312 ("the essential element or focus of the [of injury-to-a-child] statute is the result of
the defendant's conduct (in this case, serious bodily injury to a child) and not the possible combinations
of conduct that caused the result").
3. Dr. Keith Kerr of the Children's Hospital of Austin, where Greg was life-flighted, testified that
"shaken baby syndrome" is frequently identified by the existence of tell-tale retinal hemorrhages like
those Greg suffered:

 The retinal hemorrhages are of an intensity that just can't be done by many
things. In the majority of the cases it's a severely shaken baby. You know, if you fall
from a table or fall from a bed or in a car accident, you know, you survive the car
accident, or maybe fall off a bike, those things don't do this. The amount of force is
unbelievable that requires this sort of damage. And the brain injury is obviously
reflective of the fact that the child has been badly injured.

 You know, sometimes it's not so much the bleeding in the brain of things like
that, it's the fact that the brain was ripped apart with a violent shaking that causes the
brain to swell, cause the soft spot to come up and then the eye exam is reflective of
what went on in the brain. So it's a very specific thing to see in children who are badly
shaken.

After discussing the "typical" shaken-baby scenario, Dr. Kerr noted

 Well, typically what's talked about is that someone was so angry that they
shake and then they throw. But shaking of any sort so severely as to cause retinal
hemorrhages, it would certainly be enough to cause these injuries, but whether they're
thrown against something, that would just be one more insult.

Dr. Kerr stated that, "based on the type of injuries we saw on the scan of [Greg's] brain and just how
the baby was acting, you know, it suggested that the prognosis was going to be poor." Nonetheless, the
doctors treated Greg aggressively as they do "every single child that comes through the door trying to
allow them to survive. So every patient will get maximum therapy in an effort to try to allow them
enough time to heal." But after several days the doctors and family agreed that Greg "has a dismal
diagnosis, [and thus they were] considering withdrawing support since outcome is poor and outlook is
hopeless." They withdrew the life-support mechanisms and Greg died the next day.
4. At least not on the day that he did die. There was significant evidence that little Greg had
been severely mistreated even before this fatal incident. Part of appellant's purported rationale for his
delay in seeking medical treatment was so that the doctors could not see another "healing" bruise on the
back of his head. Appellant told his girlfriend, Amanda Legg, that they shouldn't take Greg to the
hospital even though he was obviously severely injured, limp, and suffering from bruise marks on his
inner-right ear and face because Child Protective Services personnel would be called and they would
blame appellant and Amanda Legg for child abuse.

 The medical examiner's autopsy report indicated that Greg had previously suffered rib fractures
which were in the process of self-repairing.
5. Dr. Kerr's testimony indicated that Greg was so violently shaken that he was brain dead: 
"The brain activity itself was none, and that just goes along with how bad the injury was." Dr. Kerr had
previously explained that "The brain is very fragile. Some people may compare it to the consistency of
jello, and if-the amount of force that an adult person can sort of focus on a brain is not nearly-I mean, it
can be a great deal to the point that the baby can become brain dead, and that's with no visual signs of
abuse."
6. Jefferson, 189 S.W.3d at 313.
7. Id.
8. Id. at n.11.
9. The State begins its Brief by stating, "Injury to a child is a conduct-oriented statute proscribing
several different types of conduct." This is a false premise and, unfortunately, led the State (and the
court of appeals) into relying upon Luna v. State, 493 S.W.2d 854 (Tex. Crim. App. 1973), a double
jeopardy case involving multiple sales of heroin. The crime of delivery of a controlled substance is a
conduct-oriented offense and thus each act of delivery is a separate and distinct offense. With result-oriented offenses, like murder or injury to a child, double jeopardy principles apply to the specific result
(death or injury), not the number or type of acts that led to the specific result.
10. See Alvarado v. State, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985) (stating that the
statutory offense of injury to a child does not specify the "nature of the conduct"; thus that conduct "is
inconsequential (so long as it includes a voluntary act) to commission of the crimes. What matters is that
the conduct (whatever it may be) is done with the required culpability to effect the result the Legislature
has specified.").