

**NUMBER 13-08-688-CR**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI - EDINBURG**

---

**BRIAN FELLERS,**                                                                 **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                          **Appellee.**

---

On appeal from the 36th District Court
of San Patricio County, Texas.

---

**MEMORANDUM OPINION**

**Before Justices Rodriguez, Benavides, and Vela**
**Memorandum Opinion by Justice Vela**

Appellant, Brian Fellers, and a co-defendant, Martha Vasquez, were indicted for the

first-degree felony offense of causing serious bodily injury to a child by omission. *See* TEX.

PENAL CODE. ANN. § 22.04(a)(1), (e) (Vernon Supp. 2009-2010). The jury convicted him

of the offense and assessed punishment at eighteen years' imprisonment, plus a $2,000

fine.  By three issues, appellant complains of charge error and challenges the legal and factual sufficiency of the evidence to support his conviction.  We affirm.[1]

## I. FACTUAL BACKGROUND

**A. State's Evidence**

Appellant and his ex-wife had two sons, M.F. and J.F.  In 2007, he obtained custody of both children, and he, along with three-year-old M.F., and two-year-old J.F. began living with his girlfriend, Martha Vasquez, at her parents' home in Gregory, Texas.  In the evening of November 6, 2007, appellant, Martha, M.F., and J.F. went to Sinton, Texas to return a lawnmower to appellant's mother, who testified appellant told her J.F. "had thrown up and that Martha was cleaning him up and that he wanted to go real quick and go back to go home."

Martha's sister, Angelica Vasquez, testified that when appellant, Martha, M.F., and J.F. returned home from Sinton, appellant gave J.F. a bath and that she saw J.F. throw up water on three occasions that evening–twice in the presence of Martha and appellant. Angelica stated that J.F. looked "[s]ick" and "sad."

When Angelica's boyfriend, Courtney Greer, arrived at the Vasquez home that evening, he saw that J.F. "looked a little pale" and "sick."  He saw Martha take J.F. into the bathroom, where J.F. threw up a "yellowish" substance.  Courtney testified that J.F. told him, "'My tummy hurts.'"  Later, Courtney saw Martha and appellant in their bedroom with J.F.  Courtney testified that J.F. looked pale but "didn't seem like anything was wrong." Courtney testified that he asked J.F. how he felt and that J.F. said "his stomach hurt." Courtney testified that appellant and Martha said they would take J.F. to the doctor "in the

---

[1]This appeal does not involve Martha Vasquez.  Her appeal is before this Court under a separate cause number.

morning if he's not doing any better." He also testified that J.F. had a bruise "on his forehead from when he fell, and one from when he scratched himself." He said that the fall occurred on Halloween night. He said that three or four days before J.F. died, J.F. received a bruise on the back of his legs from sitting in a chair.

In the early morning of November 7, 2007, Courtney, who spent the night at the Vasquez home, saw Martha, M.F., and J.F. inside their bedroom. Angelica testified that about 7:00 a.m. that morning, she saw Martha holding J.F., who was "pale and just limp." Martha handed J.F. to Angelica and called both 9-1-1 and appellant, who had gone to work. Courtney gave J.F. mouth-to-mouth resuscitation, and he testified that when appellant arrived at the Vasquez home, appellant "took a look at [J.F.] and he asked what was wrong and we said we didn't know."

At 7:31 a.m., J.F. arrived at the hospital via EMS and was treated there by Dr. Saiad Mustafa. Medical personnel gave J.F. chest compressions and medications, but Dr. Mustafa pronounced him dead at 7:46 a.m.

On the day J.F. died, Karen Diaz, a justice of the peace for San Patricio County, spoke to appellant at the emergency room. She testified he told her that before he left for work that morning, he "checked on [J.F.] . . . and that his [J.F.'s] breathing was labored and that he was breathing real heavy through his nose. . . ."

Stephanie Pierce, who worked for Bay to Bay Early Childhood Intervention, testified that the day after J.F. died, she asked Martha about J.F.'s death. She stated that Martha told her, "[I]t was a regular day until about 6:00 P.M. . . . [J.F.] had eaten fish sticks during the mealtime and had a corn dog later and she said he just began throwing up. . . . [T]hey were getting ready for bed and [J.F.] continued to throw up." Pierce testified that when she asked Martha why they did not take J.F. to the emergency room, Martha said, "[T]hey didn't

3

take him because she was afraid that hospital staff would see a bruise on his leg and report it to C.P.S." Martha told Pierce that J.F. "kept throwing up until around 11:00 or 12 o'clock and she [Martha] told Brian [appellant] that she didn't care. 'I don't care,' you know. 'We need to take him, Brian.'" Martha told Pierce that she fell asleep so they all went to bed. Pierce said that Martha told her "that earlier in the morning of the 7th of November around 6:30—6:00 to 6:30 . . . [J.F.] began throwing up again" and that "he went into convulsions." When he went into convulsions, "they called 9-1-1 . . . ."

After J.F. died, appellant provided the police with a recorded statement[2] concerning the events surrounding the death. Appellant stated that on the afternoon of November 6, 2007, Martha called him at work and told him that J.F. had thrown up. That evening, he gave J.F. a shower and knew that he was throwing up. He said that either Martha or Angelica gave J.F. some Tylenol. The next morning, he left for work between 5:00 and 5:30. Before he left for work, he said that J.F. was "fine."

Dr. Ray Fernandez, the Nueces County Medical Examiner, performed the autopsy and found numerous bruises and abrasions on the child's left and right upper forehead, left eye, left upper eye lid, right cheek, left and right jaws, left eyebrow, right and left upper arms, left forearm, right and left lower abdomen, right and left lower back, left and right thighs, right knee, left and right buttocks, lower right hip, left calf, and right and left lower legs. He testified that "blunt trauma," not a blood disorder, caused these injuries and that some of the bruising to the legs and face could have resulted from efforts to save his life. The internal examination of the abdominal cavity revealed "bleeding just below the pancreas" and a quarter-inch "tear of the tissue." The abdominal cavity, which should

---

[2]The State introduced appellant's recorded statement into evidence as State's exhibit 28.

4

contain no free fluid, contained 275 cc's of fluid. He stated there was "trauma to the abdomen, causing the tearing inside the abdomen; causing bleeding inside the abdomen; causing the fluid and the inflammation to build up in the abdomen." He stated the cause of death was "blunt force abdominal injuries." He said the range of time in which the abdominal trauma occurred would be anywhere from twelve hours up to two or three days and that from the time J.F. sustained this blunt-force abdominal trauma, he would have started exhibiting symptoms such as pain and vomiting. Vomiting and the loss of fluid inside the abdomen would make J.F. dehydrate and want to drink water. When the prosecutor asked him whether J.F.'s injuries could have been treated, he said, "I would say early on, the chances for treatment and survival are good. Later, chances are not good." He said the injury that caused J.F.'s death was "serious bodily injury" not consistent with falling off of a bed or falling onto the handlebars of a tricycle.

Dr. Nancy Harper, a pediatrician who served as the medical director for the CARE[3] Team at Driscoll Children's Hospital, reviewed photos of J.F.'s body that were taken after he died. She testified the bruises on both sides of his head "represent[ed] two episodes of trauma" and did "not appear consistent with accidental injury." She said the bruising to the backs of J.F.'s thighs had "[l]inear patterns," which "are often seen when children get hit with objects such as belts, looped cords, or other things that would leave a line–like distribution of bruising." When asked if this bruising could occur from the child sitting in a chair, she said, "No. Otherwise we'd have lots of children with that." However, she said "it would be possible" for J.F. "[t]o obtain these bruises if he were forced to sit in a chair." She said the bruising to his right buttock "appear[ed] patterned," meaning that "[i]t looks

---

[3]This is an acronym for "Child Abuse Resource and Evaluation."

like it was caused by . . . a tool or a hand." She said that the bruising to J.F.'s abdomen is "not what be [sic] normally see with normal childhood play, . . . ." She stated that "[t]he majority of children with abdominal injuries from bicycles and handlebars are over four years of age and that handlebar injury to the abdomen would not result in two bruises, one on either side of the abdomen. Rather, that injury "would result in more of an abdomen sort of injury towards the center, upper part of the abdomen." She did not see any sort of bruising on the center part of J.F.'s abdomen. She said that if J.F. had "been presented early enough" to the emergency room, he would have been treated for his injuries.

On cross-examination, Dr. Harper testified that "[t]he majority of children, when they sustain injuries from resuscitation, have perhaps abrasions, small bruises perhaps to the chest and face, and around their airway from intubation." She stated that if she had evaluated J.F., she would have noted that he had bruising "not consistent with normal childhood activity and I would have said that it was consistent with physical abuse." She said that "the majority of [J.F.'s] bruises are from direct impact and trauma."

**B. Defense Evidence**

Dr. Charles Harvey, a forensic pathologist and the former Galveston County Medical Examiner, testified J.F. had twenty-three bruises and fourteen abrasions on his body. He stated that about seventeen of the bruises are similar in size and that "[m]ost of them are compatible with the sort of patterns that are laid down by gripping fingers." When defense counsel asked him, "Is that consistent, in your opinion, with life-sustaining efforts that would be employed on [J.F.]?", he said, "In the emergency room and before, yes, sir; it can be." He said that the bruises on the back of the thighs were not consistent with recent trauma and that the bruises on J.F.'s lower abdomen were compatible with recent injury. He said that his findings with respect to the abdominal bruising were consistent with the findings

6

by Dr. Fernandez. He said that trauma to J.F.'s "buttock area" looked "relatively fresh" and had "a slight pattern to it. Parallel, linear lines. It could be compatible with a hand." He said that when a person has "septic shock" or "sepsis," a "lesser amount of pressure than usual" will be needed to create bruising in the skin. He opined that a tricycle or scooter "could have" caused the trauma to J.F.'s abdomen. He explained that "serious injuries can occur to kids from a low-energy type injury; that a child falling on handlebars of bicycles . . . can . . . do significant injury to the inter-abdomen area."

Dr. John Glanasnik, a pediatrician who worked at the Student Health Center at the University of Alabama-Tuscaloosa, testified that some of the bruises on J.F.'s body, especially on his elbow, forehead, cheeks, and legs, resulted from "purpuric bleeding . . . into the skin, loss of blood from the vascular system into the skin." He said that when a person has an injury to the bowel or an infection in the abdomen, "germs" get in the bloodstream and produce toxins, which cause "bruise-like bleeding into the skin," which is "part of the septic process, or sepsis process." He said that these "lesions" or bruises "could have developed" on J.F.'s body over a period of one to three hours. He did not "think they would have at all been present necessarily the evening before [J.F.'s death]." He agreed with Dr. Fernandez's finding that J.F. suffered blunt-force injury to the abdomen. He opined that J.F. did not comport with the definition of an abused child, stating "[H]e was well-nourished." He said that "in my opinion, the unfolding of events is consistent with a low-energy impact force to the abdomen setting off intestinal injury. . . . I don't see anything on that autopsy that allows one to say that this is homicide versus accidental." He stated that the weight of a child falling on solid objects can result in significant damage to the intestines. He opined that some of the bruising on J.F.'s body resulted from "life-saving techniques." When defense counsel asked him, "[I]s it unusual for parents to--kid

7

has a tummy ache, for them to give him some medicine and just put them to bed?", he said, "No, sir. . . . [I]f a child throws up three or four or five times in the evening, the first medical assumption is going to be had [sic] a stomach viral flu or had some bad food, . . . ." He further stated, "I don't see that, you know, every time a child throws up four times he's supposed to go to the emergency room in the middle of the night and be seen by a pediatrician. I don't know that that's the standard of care in the country" and "I don't see that when a two-year old throws up three or four or five times in the course of an evening and says his stomach hurts that that's necessarily going to be profoundly alarming to most parents." He stated that the abdominal injury that led to J.F.'s death could have been caused by the child falling onto the handlebars of a bicycle or scooter.

Martha Vasquez's father, Angel Vasquez, Sr., testified that M.F. and J.F. played with tricycles. The day before J.F. died, Mr. Vasquez arrived home about 8:30 p.m. and was told that J.F. had vomited when coming back from Sinton. He testified that J.F. had two bruises; "one on the lower end of the cheek and one on the buttock area." He said that J.F. looked "normal" when he saw him at 9:00 p.m., and he did not think that Martha and appellant "should have taken him to the doctor then." He said that J.F. did not "look as though he needed to be rushed to the hospital[.]" However, when defense counsel asked him, "So if he's just vomiting up food and water and had a little tummy ache, do you think you would have taken him to the doctor that night?", he said, "Well, I believe so; yes." Mr. Vasquez left for work at 6:25 a.m. the following morning, Before he left for work, he saw J.F. sleeping and testified that "[e]verything looked normal."

Rodrigo Rodriguez testified that one evening in early November 2007, he saw appellant, M.F. and J.F. at a home in Sinton. He saw both children playing. Neither child looked sick.

8

## II. DISCUSSION

## A. Serious Bodily Injury to a Child by Omission

We first address issues two and three wherein appellant contends the evidence is legally and factually insufficient to support his conviction.

### 1. Standard of Review-Legal Sufficiency

"When conducting a legal sufficiency review, a court must ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'—not whether '*it* believes that the evidence at trial established guilt beyond a reasonable doubt.'" *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)) (emphasis in original). "In doing so, we assess all of the evidence 'in the light most favorable to the prosecution.'" *Id*. (quoting *Jackson*, 443 U.S. at 319). "After giving proper deference to the fact finder's role, we will uphold the verdict unless a rational fact finder must have had reasonable doubt as to any essential element." *Id*. at 518.

Our review of a legal and factual sufficiency challenge should be examined under the principles of review for a hypothetically correct jury charge. *Grotti v. State*, 273 S.W.3d 273, 280-81 (Tex. Crim. App. 2008). "'Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof, or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). The law as authorized by the indictment means the statutory elements of the charged offense as modified by the charging instrument. *See Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000).

The indictment alleged, in relevant part, that appellant:

intentionally or knowingly, by act or omission, cause[d] serious bodily injury to [J.F.], a child 14 years of age or younger, by failing to seek medical treatment for the said [J.F.] for blunt force trauma, and . . . [appellant] had a legal or statutory duty to act, namely [appellant] was a parent of [J.F.]; . . . .

**a. Applicable Law**

Under the Texas Penal Code, "[a] person commits an offense [of injury to a child] if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, . . .: (1) serious bodily injury[.]" TEX. PENAL CODE ANN. § 22.04(a)(1); *Jefferson v. State*, 189 S.W.3d 305, 312 (Tex. Crim. App. 2006). A child is a person fourteen years of age or younger. TEX. PENAL CODE ANN. § 22.04(c)(1). "Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, . . . ." *Id*. § 1.07(a)(46).

"'[A]ct or omission' constitute the means of committing the course of conduct element of injury to a child." *Jefferson*, 189 S.W.3d at 312. "Injury to a child by omission is a 'result of conduct' offense." *Williams v. State*, 294 S.W.3d 674, 684 (Tex. App.–Houston [1st Dist.] 2009, pet. ref'd). "[T]he essential element or focus of the statute is the result of the defendant's conduct (in this case, serious bodily injury to a child) and not the possible combinations of conduct that cause the result." *Jefferson*, 189 S.W.3d at 312, *see Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985) (stating that because injury-to-a-child statute does not specify the "nature of conduct," the conduct is inconsequential to its commission as long as "the conduct (whatever it may be is voluntary) and done with the required culpability to effect the *result* the Legislature has specified") (emphasis in original).

10

The evidence is sufficient to support appellant's conviction for injury to a child by omission under section 22.04(a) of the penal code if the State proves either that he intended to cause the injury through his omission or that he was aware that his omission was reasonably certain to cause the injury. *Johnston v. State*, 150 S.W.3d 630, 636 (Tex. App.–Austin 2004, no pet.); *Dusek v. State*, 978 S.W.2d 129, 134 (Tex. App.–Austin 1998, pet. ref'd). A person acts intentionally, or with intent, with respect to a result of his conduct "when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2003). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id*. § 6.03(b). The jury may infer both knowledge and intent from any facts that tend to prove the existence of these mental states, including the defendant's acts, words, or conduct and from the nature of the wounds inflicted on the victim. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). The requisite culpable mental state may also be inferred from the surrounding circumstances. *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984).

**b. Analysis**

Dr. Fernandez testified there was "trauma to the abdomen, causing the tearing inside the abdomen; causing bleeding inside the abdomen; causing the fluid and the inflammation to build up in the abdomen." When asked if J.F.'s injuries could have been treated, he stated, "I would say early on, the chances for treatment and survival are good. Later, chances are not good." The evidence showed appellant did not seek medical treatment for J.F. Thus, a rational jury could reasonably conclude that J.F. suffered a serious bodily injury as a result of appellant's failure to seek medical treatment for him.

11

Dr. Fernandez testified "blunt trauma" caused the injuries to J.F.'s body and that some of the bruising to the legs and face could have resulted from efforts to save his life. Dr. Nancy Harper testified that if she had evaluated J.F., she would have noted that he had bruising "not consistent with normal childhood activity and I would have said that it was consistent with physical abuse." She stated that "the majority of [J.F.'s] bruises are from direct impact and trauma."

Angelica Vasquez testified that during the evening preceding J.F.'s death, appellant gave him a bath. Thus, a rational jury could reasonably conclude that by giving J.F. a bath, appellant would have seen the bruises on his lower abdomen as well as the other bruises and abrasions on his body. Furthermore, a rational jury could reasonably conclude that because appellant knew J.F. was throwing up, knew he was sick, knew his stomach hurt, knew he had the bruises to his lower abdomen and other parts of his body, and knew J.F. had "labored" breathing and was "breathing real heavy through his nose" the following morning, appellant would have known that J.F. had suffered some type of blunt-force trauma to his body.

The State presented evidence showing appellant knew about and discussed J.F.'s medical condition with Martha and that they did not take him to the hospital for fear that a bruise on his body would be discovered. We note that appellant and Martha told Courtney they would take J.F. to the doctor "in the morning if he's not doing any better." When Stephanie Pierce asked Martha why they did not take J.F. to the emergency room, Martha told her that "they didn't take him because she was afraid that hospital staff would see a bruise on his leg and report it to C.P.S." Even though this evidence leads to the conclusion that appellant's objective in failing to provide medical treatment to J.F. was to avoid detection rather than to inflict injury upon him, it also shows he was aware of J.F.'s medical

12

condition and the need to take him to a hospital. J.F.'s sickly and sad appearance, stomach ache, continuous vomiting, extensive bruising to his body, and his labored breathing on the morning of his death provide ample evidence to support a jury's determination that appellant was aware that his failure to provide medical treatment to J.F. for his blunt-force trauma was reasonably certain to cause serious bodily injury. *See Johnston*, 150 S.W.3d at 636 (stating that although evidence leads to the conclusion defendant's "objective in failing to provide medical care was to avoid detection rather than inflict injury upon [the child], it also shows that [defendant] was aware of [the child's] dire medical condition and the need to take him to the hospital."); *see Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (stating that "[m]otive is a significant circumstance indicating guilt."). Furthermore, appellant made inconsistent statements about the state of J.F.'s physical condition. In his recorded statement, he told the police that before he left for work, J.F. was "fine." However, Judge Diaz testified that when she spoke to him shortly after J.F.'s death, he told her that before he left for work, he "checked on [J.F.] . . . and that his [J.F.'s] breathing was labored and that he was breathing real heavy through his nose. . . ." Inconsistent statements are probative of wrongful conduct and are also a circumstance of guilt. *Id*.

We conclude that, viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found the essential elements of serious bodily injury to a child by omission beyond a reasonable doubt. Therefore, there is legally sufficient evidence to support the jury's verdict that appellant caused serious bodily injury to J.F. by omission.

13

### 2. Standard of Review-Factual Sufficiency

In a factual-sufficiency review, the only question to be answered is: "Considering all of the evidence in a neutral light, was a jury rationally justified in finding guilt beyond a reasonable doubt?" *Grotti*, 273 S.W.3d at 283. Evidence can be deemed factually insufficient in two ways: (1) "the evidence supporting the conviction is 'too weak' to support the fact finder's verdict;" or (2) "considering conflicting evidence, the fact finder's verdict is 'against the great weight and preponderance of the evidence.'" *Laster*, 275 S.W.3d at 518 (quoting *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006)). When a court of appeals conducts a factual-sufficiency review, it must defer to the jury's findings. *Id*. The court of criminal appeals has "set out three 'basic ground rules' implementing this standard." *Id*. (quoting *Watson*, 204 S.W.3d at 414). First, the appellate court must consider all of the evidence in a neutral light, as opposed to in a light most favorable to the verdict. *Id*. Second, the appellate court "may only find the evidence factually insufficient when necessary to 'prevent manifest injustice.'" *Id*. (quoting *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997)). Third, the appellate court must explain why the evidence is too weak to support the verdict or why the conflicting evidence greatly weighs against the verdict. *Id*. Although the verdict is afforded less deference during a factual-sufficiency review, an appellate court is not free to "override the verdict simply because it disagrees with it." *Id*.

The contrary evidence showed: (1) no one saw either appellant or Martha abuse J.F.; (2) the bruises on J.F.'s body could have been caused either by techniques used to save his life or by septic shock; (3) the fact that a young child like J.F. is throwing up and has a stomach ache does not mean the parents need to take the child to a doctor or emergency room; (4) J.F.'s abdominal injury could have resulted from a fall on a scooter

14

or tricycle; (5) M.F. and J.F. played with tricycles; (6) on the morning of his death, J.F. was asleep in the bedroom where appellant and Martha slept; (7) on the morning J.F. died, appellant went to work and was not present when J.F. became so sick that Martha called 9-1-1, and (8) appellant saw J.F. before leaving for work and saw he was "fine."

The record contains conflicting testimony with respect to how J.F. received the many bruises and abrasions to his body and how he suffered the blunt-force trauma. However, the existence of contrary evidence is not enough to support a finding of factual insufficiency. *Lee v. State*, 186 S.W.3d 649, 655 (Tex. App.–Dallas 2006, pet. ref'd); *see Goodman v. State*, 66 S.W.3d 283, 287 (Tex. Crim. App. 2001). The jury was free to accept or reject all or any portion of any witness's testimony. *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992); *see* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *see also Williams,* 294 S.W.3d at 684 (stating that "[a]ny conflict in the testimony concerning the severity, extent, and cause of [the child's] injuries . . . was for the jury to resolve."). As the *Goodman* court observed, "just as a fact finder . . . is not required to believe either the Cretan Liar or any one of the boy scouts, so the jury was not required to credit [alternative] explanations, regardless of how reasonable they may be." *Goodman*, 66 S.W.3d at 287.

Considering all the evidence in a neutral light, we hold that the evidence is not so weak that the verdict is clearly wrong and manifestly unjust and is, thus, factually sufficient to support the conviction. *See Watson*, 204 S.W.3d at 414. Issues two and three are overruled.

## C. Charge Error

In issue one, appellant contends the trial court erred by failing to *sua sponte* charge the jury at the guilt-innocence phase with an instruction limiting the specific culpable mental

state to be applied. Appellant's counsel did not object to the charge.

We analyze charge error according to the two-step test announced in *Almanza v. State*, 686 S.W.2d 157, 171-74 (Tex. Crim. App. 1985) (op. on reh'g). First, we determine if error exists in the charge. Next, if error exists, we determine whether appellant was harmed sufficiently to require reversal. *Id*.

In *McQueen v. State*, the court of criminal appeals pointed out that section 6.03 of the Texas Penal Code delineates three "conduct elements" that may be involved in a crime: (1) the nature of the conduct; (2) the result of the conduct; and (3) the circumstances surrounding the conduct. 781 S.W.2d 600, 603 (Tex. Crim. App. 1989). "Injury to a child by omission is a 'result of conduct' offense." *Williams*, 294 S.W.3d at 684. When, as in this case, the offense is a "result of conduct" crime, the abstract portion of the charge should limit the definitions of "intentionally" or "knowingly" to the "result of conduct" element. *Skillern v. State,* 890 S.W.2d 849, 869 (Tex. App.–Austin 1994, pet. ref'd).

Here, the charge defined the terms "intentionally" and "knowingly" as they related to the result of the conduct:

> A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.

> A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

The trial court did not give the full statutory definitions of "intentionally" and "knowingly;" rather, it focused strictly on "the result of his conduct or causing the result." *See* TEX. PENAL CODE ANN. § 6.03(a), (b). Because the charge limited the definitions of "intentionally" and "knowingly" to the specific culpable mental states for a result-oriented offense, we conclude the charge is not erroneous. Issue one is overruled.

## III. Conclusion

We affirm the trial court's judgment.

ROSE VELA
Justice

Do not publish.
Tex. R. App. P. 47.2(b).

Delivered and filed the 24th
day of June, 2010.