**Robert HUFFMAN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–06–00126–CR.**

Court of Appeals of Texas,
San Antonio.

Aug. 8, 2007.

Rehearing Overruled Aug. 27, 2007.

Discretionary Review Granted
Dec. 12, 2007.

Hilary Sheard, Senior Asst. Public Defender, San Antonio, for appellant.

Kevin P. Yeary, Asst. Crim. Dist. Atty., San Antonio, for appellee.

Sitting: CATHERINE STONE, Justice, KAREN ANGELINI, Justice, STEVEN C. HILBIG, Justice.

## OPINION

Opinion by KAREN ANGELINI, Justice.

Robert Huffman was convicted of failing to stop and render aid and was sentenced to twenty years imprisonment and a fine of $10,000.00. He brings three issues on appeal: (1) the jury charge did not require a unanimous verdict; (2) the trial court erred in failing to grant a mistrial after a witness testified that he did not consent to a search of his motel room; and (3) the jury charge erroneously instructed the jury about an enhancement allegation. We affirm.

### Background

Robert Huffman was accused of failing to stop and render aid after becoming involved in an accident that resulted in the death of Rafael Garcia.

At trial, Deputy Joe Costa of the Bexar County Sheriff's Department testified that on the morning of August 19, 2004, he was dispatched to Highway 281 South. When he arrived, an ambulance was already there, and the body of a young male was lying on a driveway down an embankment at the side of the road. That young male was later identified as Rafael Garcia.

Deputy Sheriff Adrian Ramirez photographed the area and collected evidence. Among the items he collected were a rear view mirror, pieces of glass, and paint chips.

Investigator Jose Trevino testified that the debris and area where the victim was found were consistent with a motor vehicle—pedestrian collision. From the items collected at the scene, Investigator Trevino was able to identify the make and model of the vehicle that had hit Garcia: a red, Dodge pickup manufactured between 2000 and 2002. These details of the suspected vehicle were broadcast throughout the media. From his investigation, Trevino was able to determine the name of the suspect and his employer, Mr. Kalisek of K Bar Construction. From his discussions with Mr. Kalisek, Trevino was able to identify the license plate and VIN number of the suspected vehicle. The registered owner of the vehicle was Robert Huffman. On August 22, 2004, Trevino went to Huffman's girlfriend's home but was unable to find Huffman at that location. Trevino then entered the details of the suspected vehicle into the TCIC/NCIC database. On November 1, 2004, the Sheriff's Department in Sumner County, Tennessee, contacted Trevino and informed him that the vehicle had been located.

James Kalisek of K–Bar Construction testified that in August of 2004, Huffman, a mechanic, was working for him as a contract laborer. According to Kalisek, Huffman had bought two vehicles from K–Bar Construction: a 1995 flat bed Dodge truck and a 2000 red Dodge pickup truck. Kalisek testified that when the company sold these trucks to Huffman, they were both in good working order and functioning.

Donna Wright worked at a bar on Highway 281 South and had known Huffman, who was a frequent customer of the bar, for eight or nine years. On Wednesday, August 18, 2004, Wright saw Huffman at the bar at around 9:00 p.m., looking for some friends. Huffman had a beer and stayed at the bar for about twenty minutes.[1] After Huffman left, Wright opened the front door to the bar and saw Huffman pulling out of the driveway in his red pickup truck and turning south on Highway 281. On Friday, August 20, 2004, Wright heard that Rafael Garcia, whom Wright had met a couple of times through her son, had been killed in a hit and run accident. After hearing the description of the suspected vehicle, she realized that Robert Huffman drove that type of vehicle and that she had not seen him since the night in question. She then called the police department.

Maria Flores testified that she saw Garcia on the evening of August 18, 2004, when Garcia had come to her house to visit her daughter. At 10:00 p.m., Flores drove him home, dropping him off about five or ten minutes later. As she turned out of his driveway, she saw Garcia walk back toward the street. Flores asked her daughter where he was going, and her daughter answered that he was probably going to a friend's house. That was the last time Flores or her daughter saw Garcia.

Rosalie Beeson was Huffman's girlfriend. At the time of the incident, Huffman had been living with her and her children. On the night of August 18, 2004, after Beeson had fallen asleep, Huffman woke her, telling her that he thought he had hit a deer. She could not remember when he left, but admitted that she never saw him again.[2]

Wesley Beeson, Rosalie Beeson's teenage son, then testified. Wesley testified that on the evening of August 18, 2004, Huffman had been home for a little while but then left after having an argument about his drinking with Rosalie Beeson. According to Wesley, he, his sister, and his mother Rosalie Beeson had been watching *The Simpsons,* a show that comes on television at 10:00 p.m. on weeknights, when Rosalie received a telephone call from Huffman. Huffman told Rosalie that he had hit a deer and wrecked his truck.[3] Wesley then went to sleep. He never saw Huffman or his pick-up truck again. Huffman's other truck remained parked at the Beeson's home and was eventually stolen.

Lisa Byington, a deputy with the Sumner County's Sheriff's Department in Tennessee, testified that on November 1, 2004, she had been patrolling a rural area. Because of the criminal activity in the area, she routinely drove around the Country Inn Motel. On the night in question, she saw a pickup truck with Texas plates in one of the open garages attached to the motel. Because the truck had out-of-state plates, she ran the license plate number by dispatch, which in turn reported that the truck might be stolen. She then got confirmation that the truck was not stolen, but that it was wanted "as a felony vehicle for latent processing."

Major Don Linzy of the Sumner County Sheriff's Department arrived at the hotel to assist Deputy Byington in securing the

---

1. Wright testified that when Huffman left the bar, he did not appear to be intoxicated.

2. Indeed, Rosalie Beeson could not remember much, and after questioning by the State, admitted that she still loved Huffman.

3. Because Huffman was talking so loud, Wesley was able to hear both ends of the conversation.

vehicle and in approaching the owner of the vehicle. Major Linzy knocked on the door to room seven and told Huffman that he was looking for someone in the hotel and asked for Huffman's name. Huffman identified himself as Robert Hocomb. Major Linzy told Huffman that the police were there in reference to the pickup truck and that they believed him to be Robert Huffman from Texas. Huffman then admitted that he was Robert Huffman.

Detective Shirley Forrest of the Sumner County Sheriff's Department obtained the search warrant for room seven and the pickup truck. In executing the search warrant, Forrest found four cans of black spray paint, a bag of sand paper, wiper blades, headlight bulbs, an Atlas, and a receipt from a Wal–Mart in Franklin, Kentucky. Franklin, Kentucky is only fifteen to twenty miles from the Country Inn Motel. And, according to Detective Forrest, there was damage to the right side of Huffman's pickup truck. The truck was then transferred back to Texas.

Michael Martinez, a forensic scientist for Bexar County, testified that he had compared the paint chips found at the scene with the areas of paint left on the pickup truck. According to Martinez, they matched.

Dr. Jennifer Rulon of the Bexar County Medical Examiner's Office performed the autopsy. She testified that Rafael Garcia's injuries were primarily to his face, head, and legs, especially the front of his thighs. According to Rulon, these injuries were consistent with him hitting the grill on the front of Huffman's pickup truck.

After hearing all the evidence, the jury found Huffman guilty and sentenced him to twenty years imprisonment and a fine of $10,000.00.

## JURY CHARGE

### A. Unanimous Verdict

In his first issue, Huffman argues that error in the jury charge created the possibility of a non-unanimous verdict in violation of the Texas Constitution.

Huffman was charged with failing to stop and render aid, which is defined in section 550.021 as follows:

(a) The operator of a vehicle involved in an accident resulting in injury to or death of a person shall:

(1) immediately stop the vehicle at the scene of the accident or as close to the scene as possible;

(2) immediately return to the scene of the accident if the vehicle is not stopped at the scene of the accident; and

(3) remain at the scene of the accident until the operator complies with the requirements of section 550.023.[4]

(b) An operator of a vehicle required to stop the vehicle by subsection (a) shall do so without obstructing traffic more than is necessary.

(c) A person commits an offense if the person does not stop or does not comply with the requirements of this section. . . .

TEX. TRANSP. CODE ANN. § 550.021 (Vernon 1999).

---

4. Section 550.023 requires the operator of the vehicle to give his name and address, registration number of the vehicle, the name of the operator's motor vehicle liability insurer and, if requested, to show his driver's license. TEX. TRANSP. CODE ANN. § 550.023 (Vernon 1999). Section 550.023 also requires the operator to provide any person injured in the accident reasonable assistance, including transporting or making arrangements for transporting the person to a physician or hospital for medical treatment if it is apparent that treatment is necessary, or if the injured person requests the transportation. Id.

Following the statutory language, the charge instructed the jury the following:

Our law provides that the operator of a vehicle involved in an accident resulting in injury to or death of a person, shall immediately stop the vehicle at the scene of the accident, or as close to the scene as possible, immediately return to the scene of the accident, if the vehicle is not stopped at the scene of the accident, and remain at the scene of the accident until the operator gives the operator's name and address, the registration number of the vehicle the operator was driving, and the name of the operator's motor vehicle liability insurer to any person injured or the operator or occupant of or person attending a vehicle involved in the collision; and provide any injured in the accident reasonable assistance, including transporting or making arrangements for transporting the person to a physician or hospital for medical treatment if it is apparent that treatment is necessary.

And, the application paragraph stated the following:

Now, if you find from the evidence beyond a reasonable doubt that on or about 19th day of August, A.D., 2004, in Bexar County, Texas, the defendant, Robert Huffman, did operate a vehicle, to-wit: a truck, upon a highway or public place, and was then and there, while so operating said vehicle, involved in an accident resulting in death of a person, namely: Rafael Garcia, and Robert Huffman knowing said accident had occurred failed to immediately stop, return to the scene of the accident, *or* remain at the scene of the accident, to give Robert Huffman's name and address, the registration number of the vehicle Robert Huffman was driving, *or* the name of Robert Huffman's motor vehicle liability insurer to Rafael Garcia; *or* to provide Rafael Garcia reasonable assistance, including transporting or making arrangements for transporting Rafael Garcia to a physician or hospital for medical treatment, when it was apparent that treatment was necessary, then you will find the defendant guilty of failure to stop and render aid as charged in the indictment.

(emphasis added).

Huffman argues that pursuant to the Texas Constitution and Texas statutes, a jury's findings on subsections (1), (2), and (3) of section 550.021(a) must be unanimous and that because the jury was charged in the disjunctive, it could have returned a non-unanimous verdict. The State responds by arguing that because subsections (1), (2), and (3) are the manner or means of committing the offense, jury unanimity was not required.

Under the Texas Constitution, jury unanimity is required in felony cases, and under Texas statutes, it is required in all criminal cases. TEX. CONST. art. V, § 13; TEX.CODE CRIM. PROC. ANN. arts. 36.29(a), 37.02, 37.03, 45.034–.036 (Vernon 2006); *see also Ngo v. State*, 175 S.W.3d 738, 745 (Tex.Crim.App.2005).

To say that the jury must be unanimous, however, does not explain what the jury must be unanimous about. For this we look to the statutory language defining the crime and its elements. The principle justification for the unanimity requirement is that it ensures that each juror is convinced beyond a reasonable doubt that the prosecution has proved each essential element of the offense. Thus, while jury unanimity is required on the essential elements of the offense, when the statute in question establishes different modes or means by which the offense may be committed, unanimity is generally not required on the alternate modes or means of commission.

*Jefferson v. State,* 189 S.W.3d 305, 311 (Tex.Crim.App.2006) (quoting *State v. Johnson,* 243 Wis.2d 365, 627 N.W.2d 455, 459–60 (2001)).

Thus, ordinarily, "the first step in a unanimity challenge is an examination of the language of the statute in order to determine the elements of the crime and whether the legislature has created a single offense with multiple or alternate modes of commission." *Id.* "The point is to determine legislative intent: did the legislature intend to create multiple, separate offenses, or a single offense capable of being committed in several different ways?" *Id.* "For example, where the legislature has specified that any of several different mental states will satisfy the intent or mens rea element of a particular crime, unanimity is not required on the specific alternate mental state as long as the jury unanimously agrees that the State has proven the intent element beyond a reasonable doubt." *Id.*

However, federal constitutional due process considerations limit a state's ability to define a crime so as to dispense with the requirement of jury unanimity on the alternate means or modes of committing it. *Id.* at 312. Thus, "the second step in the analysis is an evaluation of whether the lack of jury unanimity on the alternate means or modes of commission violates due process." *Id.* Such an evaluation "involves an inquiry into the fundamental fairness and rationality of the legislative choice, starting, however, with a presumption that the legislature has made its determination fairly and rationally." *Id.*

In *Jefferson v. State,* the Texas Court of Criminal Appeals applied this analysis in considering whether a jury instruction was required to inform the jury that it had to unanimously agree on at least one of the following three separate theories in order to convict the defendant: (1) that the defendant injured the child by commission (striking the child with his foot or with an unknown object), (2) that the defendant injured the child by omission by failing to prevent the child's mother from injuring the child, or (3) that the defendant injured the child by omission by failing to provide proper medical care to the child. 189 S.W.3d 305, 306 (Tex.Crim.App.2006). According to the court, the first question it must address was "whether the Legislature intended to make 'act or omission' in section 22.04(a) separate elements of the offense or underlying 'brute facts [or means that] make up a particular element.'" *Id.* at 312 (quoting *Richardson v. United States,* 526 U.S. 813, 817–18, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999)) (alteration in original). The court concluded that "the Legislature intended the latter—that 'act or omission' constitute the means of committing the course of conduct element of injury to a child." *Id.* In so concluding, the court reasoned that such an interpretation of legislative intent is supported by the language of section 22.04(a) and prior case-law. *Id.* According to the court, construing the statute "to mean that the conduct element of the offense can be committed by a combination of these two means is consistent with its plain language." *Id.* And, the court emphasized that its own "prior case-law also supports a decision that the essential element or focus of the statute is the result of the defendant's conduct (in this case, serious bodily injury to a child) and not the possible combinations of conduct that cause the result." *Id.* Thus, the court concluded that "act or omission" "are not elements of an injury to a child offense about which a jury must be unanimous." *Id.*

In her concurring opinion, Judge Cochran noted that she joined the majority but wrote separately "only because the resolution of cases of this nature may not be

intuitively obvious to the discerning reader, except perhaps to one's eighth-grade English teacher who is accustomed to parsing sentences and diagramming adverbial phrases." *Id.* at 314 (Cochran, J., concurring). Judge Cochran first explained that the majority had correctly held that "the unanimity requirement is directed toward that act which makes the conduct criminal." *Id.* Thus, to determine the forbidden conduct, a court must look to the statute defining the penal offense. *Id.* In defining the offense of injury to a child, the legislature stated:

> (a) A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, elderly individual, or disabled individual:
>
> (1) serious bodily injury;
>
> (2) serious mental deficiency, impairment, or injury; or
>
> (3) bodily injury.

TEX. PENAL CODE ANN. § 22.04 (Vernon Supp.2006).

According to Judge Cochran, in determining what conduct a jury must be unanimous about, a court should "look for the main (transitive) verb in the statute." *Jefferson*, 189 S.W.3d at 314 (Cochran, J., concurring). Thus, in looking at section 22.04, the main verb is "causes." *Id.* "Because the verb 'causes' requires a direct object, the full description of the prohibited conduct, under section 22.04(a)(1)," as alleged in the indictment, is "causes serious bodily injury." *Id.* "The other elements that require unanimity are: the defendant; the person who suffered serious bodily injury; and the specific occasion on which the act occurred." *Id.*

Judge Cochran noted that one might reasonably question her analysis:

But, one might reasonably ask, aren't "striking Raysate Knight [the victim] with his foot," "causing Raysate Knight's head to strike an unknown object," "failing to intercede or stop the physical abuse of Raysate Knight by Connie Knight [his mother]," and "failing to provide proper medical care to Raysate Knight," all very different acts? Yes, of course they are. But the specifics of how the defendant caused serious bodily injury are not the gravamen of the offense and not the statutorily prohibited conduct. In this statute, the legislature was concerned about the result of the defendant's conduct; he caused serious bodily injury. It really doesn't matter, for purposes of criminal liability, *how* he did it. He may have done it with an affirmative act; he may have done it by failing to act when he should have acted. He may have hit her, bitten her, poisoned her, or failed to stop someone else from hitting her, biting her, or poisoning her. It would be nice to know *exactly* what the defendant did—precisely what act he performed or failed to perform that caused serious bodily injury—but the legislature did not predicate criminal liability for injury to a child on the specific act the defendant performed. It is enough, for purposes of criminal liability, that the defendant did "something" or failed to do "something," and that act, whatever it may be, caused serious bodily injury.

*Id.* at 315 (emphasis in original).

Returning to rules of grammar, Judge Cochran distinguished the main verb, which defines the prohibited conduct and to which the unanimity requirement applies, from other "descriptive phrases that define the 'manner and means' by which the defendant commits the prohibited act." *Id.* Judge Cochran noted that "[u]sually, those descriptive averments are adverbial phrases introduced by the preposition

'by.'" *Id.* Thus, according to Judge Cochran, *"by* striking Raysate Knight with his foot," *"by* causing Raysate Knight's head to strike an unknown object," *"by* failing to intercede or stop the physical abuse of Raysate Knight by Connie Knight," and *"by* failing to provide proper medical care to Raysate Knight," "are all adverbial phrases describing precisely *how* the defendant caused serious bodily injury to Raysate." *Id.* (emphasis in original). Thus, those acts or omissions do not require jury unanimity. *Id.*

Recently, in *Stuhler v. State,* 218 S.W.3d 706, 717 (Tex.Crim.App.2007), the court of criminal appeals adopted Judge Cochran's analysis in considering whether the jury must unanimously find that the appellant caused bodily injury and that the appellant caused serious mental deficiency, impairment, or injury pursuant to section 22.04 (the same statute at issue in *Jefferson* ). The court noted that in her concurring opinion in *Jefferson* Judge Cochran had suggested a "general rule of thumb" for making this determination of legislative intent:

> In sum, we must return to eighth-grade grammar to determine what elements the jury must unanimously find beyond a reasonable doubt. At a minimum, these are: the subject (the defendant); the main verb; and the direct object if the main verb requires a direct object (i.e. the offense is a result-oriented crime).... Generally, adverbial phrases, introduced by the preposition "by," describe the manner and means of committing the offense. They are not the gravamen of the offense, nor elements on which the jury must be unanimous.

*Id.* at 718 (quoting *Jefferson,* 189 S.W.3d at 315–16 (Cochran, J., concurring)) (alterations in original).

In applying this rule of thumb to the facts presented, the court concluded that the jury charge should have required a unanimous verdict on the issue of whether the appellant caused serious mental deficiency, impairment, or injury:

> In section 22.04(a) of the Penal Code, the main verb defining the offense of injury to a child is, of course, "causes." The direct object of that main verb is, variously, "serious bodily injury," "serious mental deficiency, impairment, or injury," or plain "bodily injury." The Legislature has thus defined the offense of injury to a child according to the kind and degree of injury that results. As the court of appeals noted, these various results are set out in different subsections of the statute, and the degree of the offense is determined, at least in part, according to which of the results defendant's act or omission caused. We think that the court of appeals correctly concluded that the Legislature intended the separate results spelled out in the various subsections of the statute to be elemental and thus required jury unanimity.

*Id.* 718–19.

In applying this general rule of thumb to our case, we note that the failure to stop and render aid statute, section 550.021 "Accident Involving Personal Injury or Death," defines an offense as follows: "A person commits an offense if that person does not stop or does not comply with the requirements of this section." TEX. TRANSP. CODE ANN. § 550.021(c) (Vernon 1999). Thus, the main verbs are "does not stop" and "does not comply." The direct object of "does not comply" is "the requirements of this section." As noted previously, pursuant to the requirements listed under subsection (a), an operator of a vehicle involved in an accident resulting in injury to or death of a person must (1) immediately stop the vehicle at the scene of the accident or as close to the scene as

possible; (2) immediately return to the scene of the accident if the vehicle is not stopped at the scene of the accident; and (3) remain at the scene of the accident until the operator complies with the requirements of section 550.023. Tex. Transp. Code Ann. § 550.021(a) (Vernon 1999).

Because these requirements are the direct object of the main verb, we conclude that the Legislature defined the offense of failure to stop and render aid according to the defendant's actions. *See Stuhler*, 218 S.W.3d at 718 (holding that because "serious bodily injury," "serious mental deficiency, impairment, or injury" and "bodily injury" are the direct objects of the main verb, the Legislature defined the offense of injury to a child according to the kind and degree of injury that results). Therefore, a jury's findings with respect to the requirements under section 550.021(a) must be unanimous. Here, however, the charge did not require jury unanimity. Instead, in the application paragraph, the jury was instructed that it could find Huffman guilty if it found either of the above requirements to be true. Therefore, the jury was erroneously charged, creating the possibility of a non-unanimous verdict.[5]

■ Having found charge error, we must now consider whether such error constituted egregious harm.[6] "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Stuhler*, 218 S.W.3d at 719. In reviewing the record to determine whether jury-charge error is egregious, we must consider the entirety of the jury charge itself, the evidence including the contested issues and weight of the probative evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole. *Id.*

■ In reviewing the record, we hold that the error did not constitute egregious harm. Although circumstantial, the evidence of Huffman's guilt was overwhelming. Moreover, Huffman's defense did not depend on some distinction between stopping, returning, or remaining at the scene. Instead, Huffman's defense was based on the State's failure to show that he was driving at the time of the incident or that whoever was driving did not stop after hitting the decedent. Therefore, we fail to see how the error caused Huffman egregious harm.

### MOTION FOR MISTRIAL

■ In his second issue, Huffman argues that the "trial court erred in failing to grant a mistrial after a prosecution witness testified that [he] did not consent to a search of his motel room." We disagree.

■ We review a trial court's ruling on a motion for mistrial for abuse of discretion. *Archie v. State*, 221 S.W.3d 695, 699 (Tex.Crim.App.2007). Thus, we must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Id.* "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Id.* (quoting *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim.App.2004)).

---

**5.** Having held that the Legislature contemplated jury unanimity with respect to the statute at issue, we need not proceed to the second step of the analysis, which asks whether dispensing with the jury-unanimity requirement violates due process. *Stuhler*, 218 S.W.3d at 719.

**6.** Because Huffman did not object to the charge, we analyze error for egregious harm. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1984).

Here, Huffman complains of the following exchange between the prosecutor and Deputy Lisa Byington:

Q: And what were you doing at the time [the other officers] were making contact with that occupant [of hotel room number seven]?

A: I was outside of the garage stall for room number seven with Sergeant Sonny Weatherford. We were making sure that nobody came out the back door into the garage stall.

Q: All right. And what was your next involvement as far as any arrests that were made that day?

A: I was called to come to the front of the motel room. When I got around to the front, I was given the defendant, Mr. Huffman.

Q: So the occupant in room number seven had been identified, then?

A: Yes, ma'am.

Q: And who was he identified as?

A: Robert Huffman.

Q: And do you see the person that you, I guess arrested that day, Robert Huffman?

A: Yes, ma'am. He's sitting at the table in the blue and the glasses.

State: Let the record reflect that the witness has identified the defendant, Robert Huffman.

Q: And did you actually place him into custody?

A: Yes, ma'am.

Q: And after you placed him into custody what, if anything, happened with respect to the room?

A: The room was secured by the officers who were at the scene. *Since Mr. Huffman did not consent—*

Defense: Judge, I object to that. That's a comment on his failure to— Could we approach?

Court: Yeah.

(At the bench)

Defense: He has a right [under the] Fourth Amendment against search and seizure without a warrant. And she's now testifying about that, and that's a comment on him, in effect, post-arrest silence and post arrest in—requesting his rights be enforced.

Court: Out of an abundance of caution, if you want me to, I can instruct—sustain the objection, instruct the jury, if you want me to.

Defense: Yes.

(End of bench discussion)

Court: All right. Ladies and gentlemen, please disregard the last answer as well—

Defense: We move for mistrial. Defense would also move for a mistrial.

Court: All right. Denied.

Q: Now, Deputy Byington, after you arrested the defendant, was a search done of the room?

A: A search warrant was obtained, yes.

(emphasis added).

According to Huffman, although Deputy Byington's statement "was truncated by defense counsel's objection, it must have been clear to all that Officer Byington was referring to a refusal by Huffman to consent to a search of his hotel room." And, Huffman argues that the trial court's instruction to disregard Byington's answer did "little to eliminate the issue from the jury's mind—in the context it was clear that the reason the warrant had to be sought was because Huffman refused consent." In response, the State argues that the trial court's instruction cured any error. We agree with the State.

 Generally, a trial court's "instruction to disregard will be sufficient to cure any unresponsive answer." *Hughes*

*v. State,* 878 S.W.2d 142, 154 (Tex.Crim. App.1992). A mistrial is appropriate only when the improper answer is "so inflammatory as to undermine the efficacy of the trial court's instruction to disregard it." *Id.* Here, Huffman complains of six words uttered by a witness. Huffman's attorney quickly interrupted the witness, and the trial court quickly sustained the objection and instructed the jury to disregard the answer. It is clear from the questioning that the State was not seeking to elicit testimony about Huffman's failure to give consent to search, but was instead seeking testimony about his hotel room being searched. The witness's unresponsive answer was not "so inflammatory as to undermine the efficacy of the trial court's instruction to disregard it." *Id.* Therefore, the trial court did not err in denying Huffman's motion for mistrial.

We overrule Huffman's second issue.

### JURY CHARGE

 In his final issue, Huffman argues that the trial court caused Huffman "egregious harm when it instructed the jury concerning an enhancement allegation that referred in nonsensical terms to a concept that is not an offense under the laws of the State of Texas or any other jurisdiction."

The enhancement paragraph of the indictment alleged that before the commission of the offense, Huffman had been "convicted of the offense of the felony of POSS PROH FIREARM." At the beginning of the punishment phase of Huffman's trial, the prosecutor read the enhancement paragraph from the indictment. Huffman then pled true to the allegation as alleged:

State: Before the commission of the offense alleged above, on the 20th day of December, AD, 2001, in Cause Number 1997–CR–4592 in Bexar County, Texas, the defendant was convicted of the felony of p-o-s-s p-r-o-h firearm, against the peace and dignity of the State, signed foreman of the grand jury.

Court: To that allegation, Mr. Huffman, how do you plead, true or not true?

Huffman: What sir?

Court: To that allegation, Mr. Huffman, how do you plead, true or not true?

Huffman: Could I have her repeat the allegation, sir?

Court: All right.

State: Felony of p-o-s-s p-r-o-h firearm.

Huffman: True, Your Honor.

Also at the punishment hearing, State's Exhibit No. 116 was admitted in evidence after defense counsel affirmatively stated that he had "no objection" to its admission. This exhibit contains the judgment from the 144th Judicial District Court of Bexar County in Cause No.1997–CR–4592 and reflects that on January 6, 1998, Huffman was convicted of the offense of possession of a prohibited firearm.[7] Specifically, the judgment recites the following: OFFENSE CONVICTED OF: POSS PROH FIREARM 46.05 PC. Under section 46.05 of the Texas Penal Code, a person commits an offense if he intentionally or knowingly possesses, manufactures, transports, repairs, or sells: (1) an explosive weapon; (2) a machine gun; (3) a short-barrel firearm; (4) a firearm silencer; (5) a switchblade knife; (6) knuckles; (7) armor-piercing ammunition; (8) a chemical dispensing device; or (9) a zip gun. TEX. PENAL CODE ANN. § 46.05(a) (Vernon Supp.2006).

State's Exhibit No. 116 also contained fingerprints of Robert Huffman, the person convicted of possession of a prohibited firearm. Richard Contreras, a fingerprint

---

7. The judgment recites that Huffman committed the offense on July 13, 1997.

analysis and examiner with the San Antonio Police Department, testified that in comparing these fingerprints from State's Exhibit No. 116 to Huffman's fingerprints, he "identified the right index finger of Robert Huffman." Contreras then testified that according to the judgment contained in State's Exhibit No. 116, Huffman was convicted of the offense "of possession of prohibited firearm."

Detective Tony Arcuri of the San Antonio Police Department testified that on July 13, 1997, he was "dispatched for a possible burglary in action." Upon his arrival, the complainant told him that Robert Huffman, her former boyfriend, had attempted to break into her house. Detective Arcuri then saw an individual matching Huffman's description darting between two houses. When Detective Arcuri apprehended Huffman, he noticed that Huffman was "very intoxicated." When the police impounded and searched Huffman's vehicle, they found "a sawed-off shotgun, which was under the legal length of what a citizen can own."

At the charge conference on punishment, Huffman's trial counsel asked the trial court not to identify Huffman's prior conviction as "possession of a prohibited firearm."

Court: [Defense counsel], have you had a chance to look through [the charge]?

Defense: Yeah. The—Where we talk about paragraph two, witness now stated that he's convicted of the offense of possession of prohibited firearm. It reads poss proh firearm, as does the judgment.

State: That's right. It does say that in the indictment, Judge.

Court: No objection from either side?

Defense: I have an objection that you have possession of prohibited firearm, rather than poss proh, the way it is in the enhancement paragraph and in the judgment.

Court: Well, there was testimony from the witness that that meant possession of a prohibited firearm, but I'll change it back if you want.

State: Well, we're—I mean, I'm not agreeing; I'm just saying he's right when he says that's how the indictment is, but we don't think it should change.

Defense: The point I'm making is, it further goes on to say that the defendant pleaded true to that allegation, and he did not.

Court: Okay. Other than that, any objections?

Defense: No, Your Honor.

Court: Okay. We'll change it back. Anything else?

Thus, in accordance with defense counsel's request, the charge on punishment instructed the jury the following:

Paragraph Two of the indictment alleges that before the commission of the offense for which you have just found the defendant guilty, on the 20th day of December, A.D., 2001, in Cause NO.1997CR4592, in Bexar County, Texas, the defendant, Robert Huffman, was convicted on the offense of Poss. Proh. Firearm. To this allegation in Paragraph Two of the indictment the defendant has pleaded "true."

Despite trial counsel requesting this change, Huffman's appellate counsel now contends that because the charge on punishment contained the phrase "Poss. Proh. Firearm," Huffman has suffered egregious harm. We disagree and hold that Huff-

man is estopped from bringing this issue on appeal.

■■■■■ Texas law mandates that a trial court submit a charge to the jury setting forth "the law applicable to the case." *Druery v. State,* 225 S.W.3d 491, 505 (Tex. Crim.App.2007) (quoting Tex.Code Crim. Proc. Ann. art. 36.14). The court of criminal appeals has stated that an appellant "must object to the charge before he may be heard to complain on appeal about 'errors claimed to have been committed by omissions therefrom or in failing to charge upon issues arising from the facts.'" *Id.* (quoting *Posey v. State,* 966 S.W.2d 57, 61 (Tex.Crim.App.1998), and Tex.Code Crim. Proc. arts. 36.14, 36.19). On the other hand, the court of criminal appeals has also stated that "if no proper objection was made at trial to the jury charge, an appellant must claim that the alleged error was fundamental." *Id.* (quoting *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App. 1984)). That is, an "appellant will obtain a reversal only if the error was so egregious and created such harm that he or she has not had a fair and impartial trial—in short 'egregious harm.'" *Id.* (quoting *Almanza,* 686 S.W.2d at 171). The court of criminal appeals has also "noted, however, that '[i]f a party affirmatively seeks action by the trial court, that party cannot later contend that the action was error.'" *Id.* at 505–06 (quoting *Prystash v. State,* 3 S.W.3d 522, 531 (Tex.Crim.App.1999)). "Indeed, 'the law of invited error estops a party from making an appellate error of an action it induced.'" *Id.* at 506 (quoting *Prystash,* 3 S.W.3d at 531).

Thus, in *Druery v. State,* 225 S.W.3d at 506, the court of criminal appeals held that because the record reflected that the appellant "not only did not object to the omission of the lesser-included instruction on first-degree murder" but also "affirmatively requested, after inquiry by the trial judge, that the lesser-included instruction not be given," the appellant "induced the alleged error of which he now complains." *Id.* Consequently, he "may not now argue on appeal that the trial judge had a duty to *sua sponte* give the jury an instruction on the lesser-included offense of first-degree murder in the face of his specific request that the charge not be included." *Id.* Thus, because the appellant was "estopped from bringing this charge-error claim on appeal," the court would "not address whether the omission of and failure to *sua sponte* give the lesser-included instruction was erroneous or amounted to egregious harm." *Id.*

Here, Huffman's trial counsel requested that the trial court change the charge back to "Poss. Proh. Firearm." Therefore, he cannot now claim on appeal that trial court caused egregious harm by granting his request and changing the charge. We, therefore, overrule Huffman's last issue.

CONCLUSION

We affirm the judgment of the trial court.