1102-15

NO. PD-1102-15

ORIGINAL

IN THE

COURT OF CRIMINAL APPEALS

OF TEXAS

RECEIVED IN
COURT OF CRIMINAL APPEALS

NOV 02 2015

Abel Acosta, Clerk

BENITO GARZA,
                    Appellant/Petitioner

VS.

THE STATE OF TEXAS,
                    Appellee/Respondent

APPELLANT'S PRO SE PETITION FOR DISCRETIONARY REVIEW

In Appeal No.04-14-00682-CR

from the

Court of Appeals

for the Fourth Judicial District

San Antonio,Texas

FILED IN
COURT OF CRIMINAL APPEALS

NOV 02 2015

Abel Acosta, Clerk

( ORAL ARGUMENT REQUESTED )

Benito Garza
TDCJ# 01957561
3001 S. Emily Dr.
Beeville, TX 78102

I.

# TABLE OF CONTENTS

Pg.

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . 1

STAEMENT OF CASE . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF PROCEDURAL HISTORY . . . . . . . . . . . . . 3

GROUNDS FOR REVIEW . . . . . . . . . . . . . . . . . . . 4

GROUND ONE:

The Court of Appeals erred by holding that the trial court
did not err in denying a unanimity instruction in the jury
sharge. . . . . . . . . . . . . . . . . . . . . . . . . 5-8

GROUND TWO AND THREE:

Garza was denied the effective assistance of counsel a trail
and on appeal. (trial one;appealtwo). . . . . . . . . . . 9-11

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . 12

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . 13

APPENDIX "A"
(Memorandum Opinion from Court of Appeals)

APPENDIX "B"
(RR3,pgs.91-118, "robbery testimony")

APPENDIX "C"
(RR4,pgs.206-208, "request for lesser included offense instruction)

[Appendix A,B, and C in Original Copy only]

# INDEX OF AUTHORITIES

Pg.

Blott v. State,588 S.W.2d 588,592
(Tex.Crim.App.1979). . . . . . . . . . . . . . . . . . . 10

Hernandez v. State,726 S.W.2d 53,57
(Tex,Crim.App.1986). . . . . . . . . . . . . . . . . . 9,10

Kitchens v. State, 823 S.W.2d 256,258
(Tex.Crim.App.1991). . . . . . . . . . . . . . . . . . 6

Mercado .v. State,615 S.W.2d 225,228
(Tex.Crim.App.1981). . . . . . . . . . . . . . . . . . 9

Mitchell v. State,68 S. W.3d640,642
(Tex.Crim.App.2002). . . . . . . . . . . . . . . . . . 9

Narvaiz v. State, 840 S.W.2d 415,434
(Tex.Crim.App.1992). . . . . . . . . . . . . . . . . . 9

Ngo v. State,175 S.W.3d 738
(Tex.Crim.App.2005). . . . . . . . . . . . . . . . . . 6,7

Richardson V. U.S.,119 S.Ct.1707
(1999). . . . . . . . . . . . . . . . . . . . . . . . 5

Schad v. Arizona, 111 S.Ct.2491. . . . . . . . . . . . . 5

Solis v. State, 792 S.W.2d 95,100
(Tex.Crim.App.1991). . . . . . . . . . . . . . . . . . 10

Strickland v. Washington,466 U.S.668,686
(1984). . . . . . . . . . . . . . . . . . . . . . . . 9,10

White v. State,308 S.W.3d 467
(Tex.Crim.App.2006) . . . . . . . . . . . . . . . . . . 5

## STATUTES / CONSTITUTIONS

Tex.Penal Code §1.07(23) . . . . . . . . . . . . . . . . 8

Tex,Penal Code § 19.02(b)(3) . . . . . . . . . . . . . . 6,7

Tex.Penal Code §38.04(b)(3). . . . . . . . . . . . . . . 11,12

Texas Code of Criminal Procedure Art. 36.29(a) . . . . 7

Tex.Const.Art.I, §10. . . . . . . . . . . . . . . . . . 9

Tex.Const.Art.V,§13 . . . . . . . . . . . . . . . . . .7

NO. PD-1102-15

IN THE

COURT OF CRIMINAL APPEALS

OF TEXAS

---

BENITO GARZA,
                    Appellant/Petitioner

vs.

THE STATE OF TEXAS,
                    Appellee/Respondent

---

APPELLANT'S PRO SE PETITION FOR DISCRETIONARY REVIEW

---

TO THE COURT OF CRIMINAL APPEALS OF TEXAS:

Appellant/Petitioner respectfully submits this Petition for Discretionary Review and moves that this Honorable Court grant review of this cause and offers the following in support thereof:

STATEMENT REGARDING ORAL ARGUMENT

The Appellant/Petitioner requests oral argument in this case because such argument may assist the Court in applying the facts to the issues raised. It is suggested that oral argument may help clarify the issues due to the liklihood that Appellant/ Petitioner failsto convey his points in written form due to the fact that he is not a lawyer or paralegal.

1.

## STATEMENT OF CASE

This case involves jury instruction error on unanimity, in a Felony Murder charge under TEX.PENAL CODE §19.02(b)(3), naming two alternate felonies, EVADING ARREST IN A VEHICLE and ROBBERY THREATS. The victim in this case died as a result of injuries sustained in a motorcycle accident. On appeal Garza raised two points of error addressing jury unanimity and erroneous jury instruction. This case is distinguished from the case relied upon by the Court of Appeals in affirming the conviction. The Appellant/Petitioner is not a lawyer or paralegal and is proceeding pro se to advance his claims seeking relief.

## STATEMENT OF PROCEDURAL HISTORY

In Cause No.2013-CR-9168, Garza was charged with the offense of Felony Murder under TEX.PENAL CODE §19.02(b)(3). Garza was convicted by a jury and sentenced to 60 years in prison. A timely appeal was taken to the Fourth Court of Appeals, San Antonio under cause no. 04-14-00682-CR. The Appeals Court Affirmed the trial court's judgment in an opinion by Justice Patricia O.Alvarez, delivered and filed on August 5,2015. No motion for rehearing was filed. On this 26 day of OCTOBER ,2015, this Petition for Discretionary Review was timely forwarded to the Court of Criminal Appeals for filing pursuant to Rule 9.2(b), Texas Rules of Appellate Procedure.

## GROUNDS FOR REVIEW

ONE. (RR3-pgs.90-119)

The Court of Appeals erred by holding that the trial court did not err in denying a unanimity instruction in the jury charge.

TWO. (RR4-206-208) (RR3-pg90-119)

Garza was denied the effective assistance of counsel at trial.

Garza was denied the effective assistance of counsel on appeal.

The Court of Appeals erred by holding that the trial court did not error in denying a unanimity instruction in the jury charge.

## Argument and Authorities

In the instant case, the court of appeals relied on White v. State, 308 S.W.3d 467. This case is distinguished from that case by the difference in the underlying felonies. In White, the underlying felonies are unauthorized use of a vehicle and evading arrest or detention. The White Court held that those felonies were basically morally and conceptually equivalent, and therefore jury unanimity was not required. The White Court went on to erroneously redefine the word "felony" as "manner or means that make up the felony element in §19.02(b)(3)." The Supreme Court in Richardson v. U.S., 119 S.Ct.1707(1999). Stated that the Constitution itself limits a State's power to define crimes in ways that would permit juries to convict while disagreeing about means, at least where the definition risks serious unfairness and lacks support in history and tradition. Schad v. Arizona,501 U.S.at 632-633, 111 S.Ct.2491 (plurality opinion)

The main point of this case is that the Petitioner is actually innocent of the Robbery Threat offense, which is one of the two named underlying felonies in the insdictment.(see RR3,pgs 90-119, Appendix "B", "robbery" testimony). The prosecutors charged the robbery as an underlying felony as a means of submitting prejudicial extraneous offense evidence, to taint the jury. The state had no intention of relying on this offense to obtain a conviction

violation "since general verdicts will stand if at least one of the 'theories' alleged is proved." Kitchens v. State,823 S.W.2d 256, 258 (Tex.Crim.App.1991). When the White Court redefined the 'felony' in Section 19.02(b)(3) dispensing with jury unanimity, it opened the door for prosecutors over-charging a offense to maximize the crime in the minds of the jurors, with an obligation of only proving one of however many paragraphs are applied.

Petitioner would show that the White case conflicts with its prior holdings in Ngo v. State, 175 S.W.3d 738 (Tex.Crim.App. 2005). The Ngo case involved credit card abuse based on an indictment alleging seperate acts of stealing credit card, recieving stolen card, and fraudulently presenting it. [all are manner or means of commiting credit card abuse][emphasis mine throughout] Defendant in that case appealed alleging denial of right to a unanimous verdict. The Eastland Court of Appeals reversed and remanded. State's petition for review was granted. The Court of Criminal Appeals held en banc, Cochran,J that:

(1) instruction was erroneous in failing to require juror

unanimity on at least one of the three disjunctively submitted offenses, i.e.,stealing credit card, recieving stolen card, or fraudulently presenting it, and

(2) the error caused egregious harm.

Petitioner points out that the holdings of the Court of Criminal Appeals in Ngo fit the circumstances of this case because the underlying offenses named in the indictment require different elements of proof to connct them to the cause of death. A look at the indictment in this case will reveal the manner and means that did not require jury unanim ity. It was the multiple ways

6.

of operating a motor vehicle in a dangerous way. (see Mem.Op. pgs.2-3,Appendix "A") "The phrase "manner or means" for an offense describes "how" the defendant committed the specific statutory criminal act, but it does not mean that the state can rely upon a laundry list of different criminal acts and let the individual jurors take their pick on which each believes the defendant committed." Vernon's Ann.Texas Const.Art.5§13; Vernon's Ann. C.C.P. art.36.29(a). see Ngo v. State, 175 S.W.3d 738,745-47 (Tex.Crim.App.2005).

In the instant case, the victim dies as a result of injuries sustained in a car wreck. The "dangerous act" that caused the death was alleged in the indictment as "multiple "ways of driving dangerously. (see Mem.Op.pgs.2-3, Appendix "A").

The charged offense is murder, which is a "specific" statutory criminal act. The "how" or "manner or means of casuing death is the operation of a motor vehicle. Therefore "Robbery" cannot be a manner or means of committing murder. You cannot operate a motor vehicle by "robbing" it. The same principle applies to evading arrest. You can operate a vehicle to evade arrest. but you cannot evade arrest as a "manner or means" of operating that vehicle.

Petitioner would contend, that the "felony" named in §19.02(b)(3) is the offense that provides culpability to the offense and designates the elements to be proven beyond a reasonable doubt. In this case, the Robbery, and the Evading Arrest were "seperate" offenses, and should have been charged as seperate "counts" not under sperate "paragraphs."

7.

This case is a reminder of "why" juror unanimity was established in the first place. So a jury would decide a case based on the evidence presented in "ONE" charge. By dispensing with juror unanimity there is no way to prevent potentially prejudicial evidence from coming before the jury under the "guise" of a "theory" or different way of committing the same offense. This undermines the whole concept of Due Process and Rules of evidence.

Based on the issues raised in this Petition. Garza has shown this Court that there are issues related to the denial of a unanimity instruction that must be addressed by this Court. Somehow there needs to be precedent that prevents dispensing with jury unanimity on seperate felonies charged under a single count. A jury should be limited to hearing evidence "only on those elements it will base its verdict on." Paragraphs should not be used to present evidence that the state is not required to prove to obtain a conviction.

White v. State, unlawfully dispenses with juror unanimity by redefining a word that is clearly defined in the Penal Code in which it is useed. Tex.Penal Code § 1.07 "Felony" means an offense so designated by law or punishable by death or confinement in a penitentiary.

## Conclusion

Garza was entitled by right to a unanimity instruction. It was error to deny that instruction and the Court of Appeals erred when it found no error. Garza was egregiously harmed by the denial of that right and the ability for the state to unalwfully charge an offense it didn't have to prove affecting the verdict.

8.

Garza was denied the effective assistance of counsel at trial and on appeal. U.S.C.A.6

## Argument and Authorities

The United States Supreme Court held in Strickland v. Washington, 466 U.S.668, 686 (1984), that the benchmark for judging any claim of ineffective assistance of counsel is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. The Court in Strickland set forth a two-part standard, which has been adopted by Texas. See Hernandez v. State,726 S.W. 2d 53, 57(Tex.Crim.App.1986). First, the defendant must prove by the preponderance of the evidence that counsel's representation fell below an objective standard of reasonableness. Mitchell v. State, 68 S.W.3d 640, 642(Tex.Crim.App.2002); Narvaiz v. State, 840 S.W.2d 415,434(Tex.Crim.App.1992)(citing Strickland v. Washington, 466 U.S. at 688). Reasonably effective assistance of counsel does not require error-free counsel, or counsel whoce competency is judged by hindsight. Mercado v. State, 615 S.W.2d 225, 228 (Tex.Crim.App.1981). Second, there must be a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. A "reasonable probability" is " a probability sufficient to undermine confidence in the outcome." Id.

Article I,Section 10 of the Texas Constitution also requires that a criminal defendant recieve effective assistance of counsel. However, the Texas constitutional provision does not create a s::

standard that is more protective of a defendant's rights than that established in Strickland Black v. State, 816, S.W.2d 350,357 (Tex.Crim.App.1986)) citing Hernandez v. State, 726 S.W.2d 53 (Tex. Crim.App.1986). Therefore,an analysis of the effectiveness of the applicant's trial counsel in the primary case pursuant to the Strickland standard does not satisfy either the federal or state constitutional requirement.

The court will not use hindsight to second-guess a tactial decision made by trial counsel, nor will the fact that another attorney might have pursued a different course support a finding of ineffectiveness. Solis v. State,792 S.W.2d 95, 100(Tex.Crim. App,1990); Blott v. State,588 S.W.2d 588,592 (Tex.Crim.App.1979). When evaluating an ineffective assistance claim, the reviewing court looks at the totality of the representation and the particular circumstances of the performance, the court indulges a strong presumption that he acted within the wide range of reasonable professional assistance. Id.

At Trial....

Garza herein raises the ineffective assistance of counsel for not subjecting the State's case to meaningful adversarial testing on the robbery offense alleged in the indictment as a underlying felony. It can be discerned from the record (RR3-pgs.90-119) that Garza was unlawfully charged with Robbery. Trial Counsel made no effort to quash the indictment based on the robbery allegation, nor did he make an attempt to sever the robbery charge from the evading arrest charge. The prejudicial affect of the extraneous offense evidence presented "through" the robbery charge

10.

seriously affected the jury's decision making process and it would be unwise to think that it made no difference in the length of the sentence imposed by that jury. The fact that the robbery charge required different elements to be proven, was enough to move a reasonable attorney to use some form of challenge to sever the robbery. The failure to challenge this through a motion to quash or some similar pre-trial motion potentially forfieted Garza's ability to challenge this robbery issu on appeal.

Trial counsel also failed to object to the jury charge after being denied a unanimity instruction as well as lesser included offense instructions. (Appendix C) It is reasonable to expect trial counsel to object and preserve for appeal issues that he himself raised to the court.

## On Appeal

Garza was denied the effective assistance on appeal when the appellate attorney appointed by the court failed to raise the insufficiency of evidence on the robbery charge and demonstrate the prejudicial affect that charge had on thejury. The robbery charge being found insufficiently supported by evidence would "support" the error and harm on the grounds raised addressing jury unanimity.

Appellate counsel also failed to raise the denial by the court of the lesser included offense under §38.04 (see Appendix C). These errors by the appellate counsel potentially prejudiced his ability to challenge these issue by any other menas. It is not reasonable to forfiet reversible error by failing to raise it on direct appeal.

11.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Petitioner prays that this Court grant this Petition for Discretionary Review, and that the case be set for submission; that after submission this Court reverse the judgement of the Court of Appeals and reform the judgement to reflect a remand to the trial court for new trial on the single count of Evading Arrest Causing Death under Texas Penal Code §38.04(3)(3).

Respectfully submitted,

_Benito Garza_

Benito Garza, Pro se

TDCJ# 1957561

3001 S. Emily Dr.

Beeville, TX 78102

12.

## CERTIFICAT OF SERVICE

The undersigned Appellant/Petitioner hereby certifies that a true and correct copy of the foregoing Petition for Discretionary Review has been mailed, U.S. mail, postage prepaid, to the District Attorney's Office Bexar County, Texas at Paul Elizondo Tower, 101 W. Nueva Street, San Antonio, TX 78205. And also to the Office of the State Prosecuting Attorney(Attn.Lisa McMinn),P.O. Box 12405, Austin, TX 78711, on this the 26 day of OCTOBER, 2015

_____
Benito Garza

APPENDIX A

"Memorandum Opinion"



# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-14-00682-CR

Benito **GARZA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 187th Judicial District Court, Bexar County, Texas
Trial Court No. 2013CR9168
Honorable Raymond Angelini, Judge Presiding

Opinion by:　Patricia O. Alvarez, Justice

Sitting:　　　Marialyn Barnard, Justice
　　　　　　Patricia O. Alvarez, Justice
　　　　　　Jason Pulliam, Justice

Delivered and Filed:　August 5, 2015

AFFIRMED

Appellant Benito Garza was charged by indictment with felony murder. The jury convicted Garza and assessed punishment at sixty years' confinement in the Institutional Division of the Texas Department of Criminal Justice. On appeal, Garza contends the trial court erred by failing to provide a unanimity instruction in the court's charge. Because the unanimity requirement is not violated by instructing the jury on alternative legal theories of committing the same offense, we affirm the trial court's judgment.

## FACTUAL BACKGROUND

On September 21, 2012, San Antonio police officers responded to a home invasion in the Indian Creek subdivision in San Antonio, Texas. The suspect left the subdivision in a small gray Kia vehicle. Officer Nathan Zachary was in route to the location when he witnessed a small gray Kia traveling the opposite direction on Five Palms Drive. Officer Zachary activated the overhead lights and sirens on his marked vehicle and attempted to stop the Kia. Officer Zachary continued to follow the Kia through a gas station parking lot and down Old Pearsall Road where the Kia ran a red light. The officer suspended his chase when the Kia entered the exit ramp of Interstate Loop 410 traveling the wrong direction into oncoming traffic.

The Kia ran head-on into a motorcycle carrying Roxana and Pedro Tenorio. Pedro was killed on impact and Roxana survived the collision, but lost her leg. The driver of the Kia exited his vehicle carrying a shotgun and was apprehended in a nearby school bus parking lot. The driver of the vehicle was identified as Appellant Benito Garza.

Garza was charged by indictment with felony murder, with an enhancement paragraph alleging a prior felony conviction and a deadly weapon enhancement. The two paragraph indictment alleged:

PARAGRAPH A
on or about the 21st Day of September, 2012, BENITO GARZA, hereinafter referred to as defendant, did then and there commit or attempt to commit the felony offense of EVADING ARREST IN A VEHICLE, and while in the course of or in furtherance of or in immediate flight from the commission or the attempted commission of this offense, the defendant did then and there commit or attempt to commit an act clearly dangerous to human life, to wit: DRIVING A MOTOR VEHICLE AT A SPEED THAT WAS NOT REASONABLE OR PRUDENT UNDER THE CIRCUMSTANCES THEN EXISTING, DRIVING A MOTOR VEHICLE AND FAILING TO APPLY THE BRAKES IN A TIMELY AND REASONABLE MANNER AND /OR DRIVING THE MOTOR VEHICLE INTO ONCOMING TRAFFIC, DRIVING A MOTOR VEHICLE AND ATTEMPTING TO PASS ANOTHER MOTOR VEHICLE WHEN IT WAS NOT REASONABLE AND PRUDENT UNDER THE CIRCUMSTANCES THEN EXISTING, DRIVING A MOTOR VEHICLE AND FAILING TO MAINTAIN A SINGLE

LANE OF TRAFFIC, DRIVING A MOTOR VEHICLE AND FAILING TO TAKE NECESSARY EVASIVE ACTION TO AVOID COLLIDING WITH ANOTHER VEHICLE IN/ON WHICH THE COMPLAINANT WAS A DRIVER OR PASSENGER WHICH CAUSED THE DEATH OF AN INDIVIDUAL, NAMELY: PEDRO TENORIO;

PARAGRAPH B

on or about the 21st Day of September, 2012, BENITO GARZA, hereinafter referred to as defendant, did then and there commit or attempt to commit the felony offense of ROBBERY THREATS, and while in the course of or in furtherance of or in immediate flight from the commission or the attempted commission of this offense, the defendant did then and there commit or attempt to commit an act clearly dangerous to human life, to wit: DRIVING A MOTOR VEHICLE AT A SPEED THAT WAS NOT REASONABLE OR PRUDENT UNDER THE CIRCUMSTANCES THEN EXISTING, DRIVING A MOTOR VEHICLE AND FAILING TO APPLY THE BRAKES IN A TIMELY AND REASONABLE MANNER AND /OR DRIVING THE MOTOR VEHICLE INTO ONCOMING TRAFFIC, DRIVING A MOTOR VEHICLE AND ATTEMPTING TO PASS ANOTHER MOTOR VEHICLE WHEN IT WAS NOT REASONABLE AND PRUDENT UNDER THE CIRCUMSTANCES THEN EXISTING, DRIVING A MOTOR VEHICLE AND FAILING TO MAINTAIN A SINGLE LANE OF TRAFFIC, DRIVING A MOTOR VEHICLE AND FAILING TO TAKE NECESSARY EVASIVE ACTION TO AVOID COLLIDING WITH ANOTHER VEHICLE IN/ON WHICH THE COMPLAINANT WAS A DRIVER OR PASSENGER WHICH CAUSED THE DEATH OF AN INDIVIDUAL, NAMELY: PEDRO TENORIO;

The trial court's charge tracked the language of the indictment, providing the two alternative theories of committing felony murder under section 19.02(b)(3). *See* TEX. PEN. CODE ANN. § 19.02(b)(3).

> A person commits an offense if he commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

*Id.* During the charge conference, defense counsel's request for the lesser included offense of criminally negligent homicide was denied. No other objections were made to the court's charge.

The jury found Garza guilty of the charged offense and made an affirmative finding of a deadly weapon. Garza entered a plea of true to the enhancement allegation, and the jury assessed

punishment at sixty years' confinement in the Institutional Division of the Texas Department of Criminal Justice.

On appeal, Garza complains the guilt-innocence charge provided two separate theories as to how Garza committed the murder of Pedro Tenorio without providing the jury with a unanimity instruction. Garza contends the trial court's error allowed the jury not to be unanimous on the question of how Garza committed felony murder. Garza further contends the error caused egregious harm.

## UNANIMITY INSTRUCTIONS

### A.    When Jury Charge Must Include Unanimity Instruction

"Under our state constitution, jury unanimity is required in felony cases, and, under our state statutes, unanimity is required in all criminal cases." *Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005); *see also Leza v. State*, 351 S.W.3d 344, 356 (Tex. Crim. App. 2011) ("Jury unanimity is required on the essential elements of the offense but is generally not required on the alternate modes or means of commission."). While "the jury must unanimously agree about the occurrence of a single criminal offense, . . . they need not be unanimous about the specific manner and means of how that offense was committed." *Young v. State*, 341 S.W.3d 417, 422 (Tex. Crim. App. 2011); *see also Pizzo v. State*, 235 S.W.3d 711, 714 (Tex. Crim. App. 2007); *Ngo*, 175 S.W.3d at 745–46.

The trial court properly charges a jury with a general verdict form when an "indictment [does] not allege different offenses but only allege[s] different ways of committing the same offense." *Aguirre v. State*, 732 S.W.2d 320, 326 (Tex. Crim. App. [Panel Op.] 1982) (op. on reh'g); *accord Zavala v. State*, 401 S.W.3d 171, 182 (Tex. App—Houston [14th Dist.] 2011, pet. ref'd). Importantly, however, alternative methods of committing the same offense are properly submitted in the disjunctive, in a general verdict form, if the evidence is legally sufficient to

support a finding of the offense under any of the theories submitted. *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991); *accord Finster v. State*, 152 S.W.3d 215, 218 (Tex. App.—Dallas 2004, no pet.).

**B.     *White v. State***

The Texas Court of Criminal Appeal's case, *White v. State*, 208 S.W.3d 467 (Tex. Crim. App. 2006), is instructive on this issue. In *White*, the defendant was convicted of felony murder under section 19.02(b)(3). *Id.* at 467. The evidence presented at trial supported that White was driving a stolen car during a high-speed chase when his vehicle collided with another vehicle, killing the driver. *Id.* The two paragraph indictment alleged White caused the victim's death during the commission of a state-jail felony, either unauthorized use of a motor vehicle or evading arrest or detention. *Id.* at 467–68. "The jury charge authorized the jury to convict appellant if it unanimously found that he caused the victim's death during the commission of either one of these two felonies without having to unanimously find which felony appellant was committing." *Id.* at 468. Like Garza, White claimed for the first time on appeal that the court's charge violated his right to a unanimous jury verdict. *Id.*

> The *White* court explained the term felony under section 19.02(b)(3):

> The term "felony" is clearly an element of Section 19.02(b)(3), thus requiring a jury to unanimously find that the defendant committed a "felony." And, in cases like this, where some of the jurors might believe that the defendant committed felony A and the rest of the jurors might believe that he committed felony B, the jury has unanimously found that the defendant committed a "felony." In addition, the transitive verb of the portion of Section 19.02(b)(3) at issue here is "commits" followed by the term "felony." This indicates that the prohibited conduct about which a jury must be unanimous is that the defendant commit a "felony," and not one specific felony out of a combination of felonies.

*Id.* (internal citations omitted); *accord Contreras v. State*, 312 S.W.3d 566, 584 (Tex. Crim. App. 2010); *see also Jefferson v. State*, 189 S.W.3d 305, 312–14 (Tex. Crim. App. 2006).

We see no distinction in the case presented before us today.

## C.     Application

Garza was charged with felony murder in a two-count indictment with "felony A" being evading arrest and "felony B" being robbery threats. Thus, because Garza's indictment alleged two felonies under section 19.02(b)(3), the actual felonies of evading arrest and robbery threats are not elements on which the jury must be unanimous. *See White*, 208 S.W.3d at 469; *Contreras*, 312 S.W.3d at 584. Instead, "[t]hese felonies constitute the manner or means that make up the 'felony' element of Section 19.02(b)(3)." *White*, 208 S.W.3d at 469; *see also Jefferson*, 189 S.W.3d at 311 n.7 (explaining the unanimity question turns on whether a particular term in the statute is an element and thus requires unanimity, or whether the term is "an underlying brute fact or means of committing an element" and does not require juror unanimity). Accordingly, the trial court did not err in failing to include a unanimity instruction in the court's charge. Having found no error, we need not address Garza's remaining issue on appeal. The trial court's judgment is affirmed.

Patricia O. Alvarez, Justice

DO NOT PUBLISH

APPENDIX "B"

(RR3-Pgs.90-119)

A.   Yes, ma'am.

Q.   -- in regards to that.  Would it help you as we go through your testimony to be able to refresh your memory from it?

A.   Yes, ma'am.

          MS. SCHULZE:  May I approach, Your Honor?

          THE COURT:  Sure.

Q.   (By Ms. Schulze)  Do you recognize this?

          (Proffered to the witness.)

A.   Yes.

Q.   Is that your signature?

A.   Yes, ma'am.

Q.   Okay.  Feel free to refresh your memory, if you need to.  So, back on September 21st, 2012, who all lived with you at 5150 Sagamore -- 5159 Sagamore?

A.   My brother, my ex-fiancée, and my dad.

Q.   What was your brother's name?

A.   Jesus Leo Flores, Junior.

Q.   And what was your fiance's name?

A.   Lucia Guerrero.

Q.   Were you guys all present at 5159 on September 21st?

A.   Not my dad.

Q.   And when the incident happened, what time of day was it?

A.    I think it was around seven o'clock.

Q.    Was it still light outside?

A.    Yes.

Q.    And what were you doing?

A.    I was shaving.

Q.    Inside the home?

A.    Yes.

Q.    And what called your attention to the fact that something was going on in your home?

A.    My brother.  He was kind of speaking loudly, something that was going on.  And when I walked out, I noticed him laying on the floor.

Q.    What was he doing laying on the floor?

A.    He was scared.

Q.    Why was he scared?

A.    Because we had just been robbed.

Q.    What did you do at that point?

A.    I ran outside and I saw the person that had robbed us running down the street.

Q.    And how did you know that was the person who had robbed you?

A.    My brother told me --

          MR. BALDERAS:  Objection, Your Honor, hearsay.

          THE COURT:  Sustained.

Q.    (By Ms. Schulze)    So you see a man running down your street.  What do you do at that point?

A.    I ran inside and grabbed my keys.

Q.    My keys to what?

A.    My vehicle.

Q.    And what did you do then?

A.    I jumped in my vehicle and I started to pursue him.

Q.    Pursue who?

A.    The guy that robbed us.  The guy that was running on foot.

Q.    Okay.  And where did you pursue him to?

A.    As I left, I started going down towards Sagamore.

Q.    I want to direct your attention to State's Exhibit 4, which should be on the monitor in front of you.

(Exhibit shown on monitor screen.)

Q.    It's a map of the area.  And do you see where your house is located on that map?

A.    Yes.  Yes, I see it.

Q.    Is it here where the red dot is?

(Counsel indicating.)

A.    Yes, ma'am.

Q.    So, how do you proceed?

A. As I backed out, I went down towards Painted Teepee.

Q. And then what did you do?

A. As I started getting close, I noticed, like, a vehicle blocking me.

Q. And how -- describe to us how the vehicle was blocking you.

A. As I got to the stop sign --

Q. Let me slow you down -- Mr. Flores, let me slow you down for a second. When you got to what stop sign? Where was it located?

A. Sagamore and Painted Teepee.

Q. Okay. So, you reached this stop sign, what do you see?

A. A gray four-door vehicle.

Q. Small or large vehicle?

A. A small one.

Q. Okay. When you see this vehicle, how was that vehicle positioned on the roadway?

A. He was kind of taking up both lanes.

Q. Could you pass in your vehicle?

A. No, I couldn't.

Q. So what did you do at that point?

A. I kind of honked at him a few times and then he moved out the way. He turned to the left.

Q.    Okay.    And then what did you do?

A.    I turned to the right on Painted Teepee.

Q.    All right.    And did you have the person that was running on foot in view at that time?    Could you see that person?

A.    Yes, I could see him.

Q.    And what was he doing?

A.    He was turning the corner on Painted Teepee and Gray Buffalo, right around there.

Q.    And once he turned the corner at Painted Teepee and Gray Buffalo what did you do?

A.    I chased him.

Q.    In your vehicle still --

A.    Yes, in my vehicle.

Q.    Then what happens?

A.    When I got to the corner of Gray Buffalo and Painted Teepee, he had already stopped.    He noticed me following him.

Q.    How could you tell that he noticed that you were behind him?

A.    Because when I started turning onto Painted Teepee, he was barely turning on Gray Buffalo and he was there waiting, like, he was there looking -- he was there looking back.

Q.    When you say he was looking, was he looking

towards you or away from you?

A.    I think he was looking at the gray car.

Q.    Okay.  Then what happened?

A.    And then as I turned, he noticed me.  And as I turned onto Gray Buffalo, he started shooting at me.

Q.    Shooting at you.  What did you do?

A.    I kept on going.

Q.    Kept on going?

A.    Yeah, I chased him a little bit more until he got into the middle of the street, which I got halfway, three-quarters down the street and he, like, he focused in on me.

Q.    And how did you know he was focusing in on you?

A.    Because he closed his eye.  He closed one eye and then he just --

Q.    Demonstrate for the jury and for us --

A.    Right.  He closed one eye and he just had his gun out.  He closed one eye just perfectly and he just looked right at me.

            (Witness demonstrating.)

Q.    With his arm straight out --

A.    Right.  With his arm straight out, right in the middle of the street.

Q.    And this is the same guy that had been running on foot from your home?

A.    Right.

Q.    Okay.  Just to be clear, do you see the gray car at this point?

A.    No, I don't.

Q.    So what happens after he focused --

A.    He --

Q.    I'm sorry, but you have to wait until I finish asking the question, then you can answer.  All right? This lady here is typing up everything that we're saying. Okay?

Once you see him focusing in on you, what do you do?

A.    I put it in reverse.  I lean over.  I put my car, like, in reverse and I just reversed straight back.

Q.    Straight back to where?

A.    Straight back on Gray Buffalo and I passed Painted Teepee.

Q.    All right.  And then what do you do?

A.    I -- like, I slammed my brakes.  I put it in drive, and as I go to turn, that silver car is blocking Painted Teepee and it's blocking the whole street.

Q.    And how did you get by this car?

A.    I honked at him a few times.

Q.    And did the car move?

A.    He pulled into the driveway right in front of

it a little bit, like -- I don't know how fast it could have been.

Q. Then what did you do?

A. I went home. As I was going home, my little brother was running down the street.

Q. Which --

A. Which is Sagamore.

Q. Your little brother, Jesus?

A. Jesus. Because they heard the gunshots.

Q. Okay.

A. So I told him to get back home. So I go home and I think I parked in front of the house. And then as I go over to the side -- and as I go into my yard, my little brother is running up and my fiancée is on the phone.

Q. Okay. What do you do at that point?

A. I just -- I'm on the phone -- I don't know -- I don't remember who I was on the phone with, but as we're there, like, talking, I kind of just, like, stared. I noticed the gray car coming back up the street, up Sagamore.

Q. And was this the same gray car that had blocked Painted Teepee?

A. Correct.

Q. Okay. So when you see this car coming towards

you again, what do you do at that point?

A.    I told my little brother and my fiancée, they need to go inside.  They need to go inside.

Q.    And what do you do?

A.    I told them to go inside because they're coming back.

Q.    Okay.  And why did you feel they needed to go inside?

A.    Because I started to, like, figure out that that was the driver.

Q.    Okay.  The driver of what?

A.    The driver that was supposed to pick up the guy running from me -- running from me.

Q.    Okay.  So you tell your little brother and your fiancée to go inside.  What do you do then?

A.    I have a next door lot that has a cement slab and I went on top of it.

Q.    Is there a house on that lot?

A.    There's not a house.

Q.    So you go next door to this empty lot with this slab, what do you do?

A.    I also have a phone in my hand.

Q.    Okay.

A.    So, as he pulls up, he's asking me if I'm okay, if everything is okay.

Q.   Okay.

A.   And I'm like, "Yeah, everything is okay, everything is okay."  And then I'm like, "We're going to call the cops."  At that point I yell at my neighbors that they just robbed us.

Q.   Okay.  And what else do you yell out?

A.   "That we've been robbed."

Q.   Okay.  And do you call the cops?

A.   No.

Q.   What does the man in the silver car do at that point?

A.   He starts freaking out.

Q.   He starts freaking out?  How could you tell by looking at him that he was freaking out?

A.   Because he told me, "Why are you calling the cops?  What are the calling the cops for?"

Q.   Okay.  And after he tells you that, what do you do then?

A.   I'm walking back.  I'm walking on my lot.  My neighbor has the truck parked, so I'm walking.  The whole time that this is going on, I'm walking towards that vehicle.

Q.   And what were you planning on doing when you got to the vehicle?

A.   Hiding.

Q. Hiding. And why were you hiding?

A. Because I didn't feel right -- it didn't feel right. We had just gotten robbed, you know, just gotten shot at, so.

Q. All right. What do you recall this individual that got out of the gray car wearing?

A. Gloves.

Q. And what else? Do you remember -- only if you can remember.

A. No, I don't remember. I just remember him just pulling up -- he pulled up in front of my neighbor's house, he opened up the door and he got out. And when he picked up his hand to, like, reach, like, for the door to get out, I saw the glove.

Q. So when you're saying that he reached to the top of the door to open it to get out --

A. Right. As he swung it open, he reached to, like, to pull himself out.

Q. And so you could see the glove?

A. Right.

Q. Were you able to see this person's face?

A. Yes.

Q. And do you see that person that got out of the silver car and approached you in the courtroom today?

A. Yes.

Q. Would you please point to him and identify him by an article of clothing.

A. Blue shirt.

(Witness indicating.)

THE COURT: The record will reflect that he identified the Defendant in this cause.

MS. SCHULZE: I'll pass the witness.

(Statement proffered to counsel.)

(Counsel perusing statement.)

MS. SCHULZE: I'm sorry, Judge, may I just ask him one more question?

THE COURT: Sure.

Q. (By Ms. Schulze) I forgot to mention this, but Mr. Flores, you are currently on felony probation; correct?

A. Correct.

Q. And what kind of case are you on felony probation for?

A. Drug.

Q. And what Court is that out of?

A. 175th.

Q. Thank you.

MR. BALDERAS: May I have a second, Your Honor?

THE COURT: Yes, sir.

gave you?

A. Yes.

Q. One of the conditions was to stay out of trouble, don't commit any further offenses; right?

A. Correct.

Q. Do not be around people who can get you into trouble. Wasn't that one of the conditions?

A. I don't remember the conditions.

Q. Well, if it was one of the conditions, that you were not supposed to be around people who could get you into trouble, living in a home out of which drugs are being sold is a violation of your probation; isn't that true?

A. Yes.

Q. Now, you were testifying about the incident that proceeded all of what you testified about earlier, the incident at your home. The person -- you said it was a person with tattoos on his face; is that correct? You testified --

A. Can you -- I don't understand what part --

Q. All right. The person in your home -- you saw a person in your home; is that correct?

A. I didn't see him in my home.

Q. All right. Where did you see him?

A. On the street.



Q. On the street. So he had not entered your house?

A. He entered my house, left the house.

Q. All right. You saw him enter the house?

A. I didn't see him enter the house.

Q. Well, then, if you didn't see him enter the house -- all you know is that you were chasing somebody -- you were chasing an individual?

A. Can I speak to my attorney, because this is getting really confusing.

(Discussion off-the-record.)

THE COURT: Question him again. Let's go.

MR. BALDERAS: May I have just a second?

(Discussion off-the-record.)

Q. (By Mr. Balderas) So, it's true, sir, that you yourself never saw anyone enter your home; is that correct?

A. No.

Q. Yes, it's correct or, no, it's not correct? Yes, it's correct, you never saw anybody enter your home?

A. Yes, never saw nobody.

Q. All right. So, we're talking about two individuals; isn't that correct, sir?

A. Yes.

Q. Isn't that correct?

A.     Yes.

Q.     The person in the gray car never entered your home; isn't that true?

A.     Yes.

Q.     The person in the gray car -- let me backtrack a little bit.

(Discussion off-the-record.)

Q.     So, the only thing you saw, sir, was a gray car in the street?

A.     Yes.

MR. BALDERAS:  I'll pass the witness, Judge.

REDIRECT-EXAMINATION

BY MS. SCHULZE:

Q.     Back on September 21st, 2012, was your younger brother, Jesus, a victim of a robbery at your home?

A.     Yes.

MR. BALDERAS:  Objection, Your Honor, only if he has personal knowledge.

THE COURT:  Overruled.  You brought it up.

Q.     (By Ms. Schulze)  And the person that robbed your brother, was he, in fact, running down 51 -- Sagamore -- the 5100 block of Sagamore --

MR. BALDERAS:  Object to leading, Your Honor.

THE COURT: It's overruled.

Q. (By Ms. Schulze) The person that was fleeing down the street, was that the person that had robbed your brother?

A. Yes.

Q. And was that the person that you followed in your car?

A. Yes.

Q. And was the person in the gray car, that you've identified to me in this courtroom today, was he the driver for the person --

MR. BALDERAS: Objection, calls for speculation.

THE COURT: Sustained.

Q. (By Ms. Schulze) From the events that happened that day, was it your belief that the driver of the gray vehicle was helping out the man that entered your home?

MR. BALDERAS: Objection, Your Honor --

THE COURT: Sustained.

MS. SCHULZE: Nothing further, Your Honor.

MR. BALDERAS: Nothing further, Judge.

THE COURT: You may step down. Thank you, Mr. Flores. And thank you, Mr. Bunk.

MR. BUNK: Yes, Judge.

(Witness excused.)

APPENDIX "C"

(RR  -Pgs.206-208)

anybody?

MR. BALDERAS: Yes, Your Honor. In addition to the Charge, we would ask for the -- the underlying offense for this indictment, Your Honor, is evading in a motor vehicle and then causing death. Evading in a motor vehicle is the initial charge or offense that leads to the death of a person while he's fleeing; so, therefore, we want -- we're requesting a Charge of evading in a motor vehicle, one.

THE COURT: Just for a lesser of evading?

MR. BALDERAS: And evading causing serious bodily injury and evading causing death.

THE COURT: Evading causing death is what we're here about. Causing serious bodily injury is what we're here about when he caused the death. I don't understand what you're asking.

MR. BALDERAS: Thirty-eight -- the second-degree felony of evading, causing the death would be Penal Code 38.04(b)(2)(a).

THE COURT: Thirty-eight what?

MR. BALDERAS: 38.04(b)(2)(a). And I'll refer to you a case that the State actually gave me, Palacios v. State, [phonetic] Your Honor.

THE COURT: (B) what?

MR. BALDERAS: 38.04(b)(2) --

THE COURT: Big B or little B?

MR. BALDERAS: Little B.

(Proffered to the Court.)

(Court perusing document.)

THE COURT: That's kind of interesting.

MR. BALDERAS: I got it from the State, Your Honor.

THE COURT: I don't care if you got it from the State. It doesn't matter.

It's talking about criminally negligent homicide is the issue. State, what do y'all have to say?

MS. GREEN: The State's position is that evading arrest under 38.04(b)(2)(a) is not a lesser included offense of felony murder, because it requires a higher mental state than felony murder does. It is along the lines of Palacios and Driver v. State, at 358 Southwest 3rd 270.

THE COURT: Let me have that case.

(Proffered to the Court.)

(Court perusing document.)

THE COURT: Okay. Your request is denied. Anything else?

MR. BALDERAS: So, as to the underlining offense of what makes this a felony murder is the underlying offense is evading arrest and murder, you're

denying that, Your Honor, under 38.04?

THE COURT: Uh-huh. They still got to prove it, yes, but they still got to prove it beyond a reasonable doubt that he was doing that, no matter what.

MR. BALDERAS: Okay. Just so I can be clear, you're denying --

THE COURT: I'm denying it, yes.

MR. BALDERAS: Thank you, Your Honor.

THE COURT: Anything further is what I'm asking?

MR. BALDERAS: Nothing further, Your Honor.

MS. GREEN: Nothing from the State.

THE COURT: Twenty minutes a side. 9:30 tomorrow.

(Court Adjourned.)

*-*-*-*-*-*-*-